# Matter of CASTRO-TUM, Respondent

*Decided by Attorney General May 17, 2018*

U.S. Department of Justice
Office of the Attorney General

(1) Immigration judges and the Board do not have the general authority to suspend indefinitely immigration proceedings by administrative closure. To the extent the Board's decisions in *Matter of Avetisyan*, 25 I&N Dec. 688 (BIA 2012), and *Matter of W-Y-U-*, 27 I&N Dec. 17 (BIA 2017), are inconsistent with this conclusion, those decisions are overruled.

(2) Immigration judges and the Board may only administratively close a case where a previous regulation or a previous judicially approved settlement expressly authorizes such an action.

(3) Neither 8 C.F.R. § 1003.10(b) nor 8 C.F.R. § 1003.1(d)(1)(ii) confers the authority to grant administrative closure. Grants of general authority to take measures "appropriate and necessary for the disposition of . . . cases" would not ordinarily include the authority to suspend cases indefinitely. Additionally, 8 C.F.R. § 1240.1(a)(1), which authorizes immigration judges to take actions that "may be appropriate" in removal proceedings, and 8 C.F.R. § 1240.1(c), which empowers immigration judges to "otherwise regulate the course of the hearing," do not entail an authority to grant indefinite suspensions. Finally, regulations empowering the Chief Immigration Judge and the Chairman of the Board to manage dockets—8 C.F.R. § 1003.9(b)(1) and 8 C.F.R. § 1003.1(a)(2)(i)(A)— grant no express authority to administratively close cases, and cannot reasonably be interpreted to implicitly delegate such authority.

(4) Under the Immigration and Nationality Act, the Department of Homeland Security has the exclusive authority to decide whether and when to initiate proceedings. Once the Department of Homeland Security initiates proceedings, immigration judges and the Board must proceed "expeditious[ly]" to resolve the case. 8 C.F.R. § 1003.12.

(5) For cases that truly warrant a brief pause, the regulations expressly provide for continuances. 8 C.F.R. § 1003.29.

(6) The Immigration and Nationality Act unambiguously states that, with respect to *in absentia* proceedings, so long as the Department of Homeland Security adequately alleges that it provided legally sufficient written notice to an alien, the alien "shall be ordered removed *in absentia* if [the Department of Homeland Security] establishes by

clear, unequivocal, and convincing evidence that the written notice was so provided and that the alien is removable." INA § 240(b)(5)(A), 8 U.S.C. § 1229a(b)(5)(A). The Immigration and Nationality Act thus imposes an obligation to proceed expeditiously to determine whether the requisite evidence supports the removal charge.

(7) Where a case has been administratively closed without the requisite authority, the immigration judge or the Board, as appropriate, shall recalendar the case on the motion of either party.

## BEFORE THE ATTORNEY GENERAL

On January 4, 2018, I directed the Board of Immigration Appeals ("Board") to refer for my review its decision in this matter, see 8 C.F.R. § 1003.1(h)(1)(i), and I invited the parties and any interested amici to submit briefs addressing questions relevant to that certification. *Matter of Castro-Tum*, 27 I&N Dec. 187 (A.G. 2018).

For the reasons set forth in the accompanying opinion, I affirm the Board's order and remand for further proceedings. I hold that immigration judges and the Board do not have the general authority to suspend indefinitely immigration proceedings by administrative closure. Accordingly, immigration judges and the Board may only administratively close a case where a previous regulation or a previous judicially approved settlement expressly authorizes such an action. Where a case has been administratively closed without such authority, the immigration judge or the Board, as appropriate, shall recalendar the case on the motion of either party. I overrule *Matter of Avetisyan*, 25 I&N Dec. 688 (BIA 2012), *Matter of W-Y-U-*, 27 I&N Dec. 17 (BIA 2017), and any other Board precedent, to the extent those decisions are inconsistent with this opinion.

## Matter of Castro-Tum

In recent years, immigration judges and the Board have increasingly ordered administrative closure to remove a large number of cases from their dockets. The Board has described the practice as "a docket management tool that is used to temporarily pause removal proceedings," *Matter of W-Y-U-*, 27 I&N Dec. 17, 18 (BIA 2017), and "remove a case from an Immigration Judge's active calendar or from the Board's docket." *Matter of Avetisyan*, 25 I&N Dec. 688, 692 (BIA 2012).

Although described as a temporary suspension, administrative closure is effectively permanent in most instances. Unless a party "move[s] to recalendar [an administratively closed case] before the Immigration Court . . . or to reinstate the appeal before the Board," *id.*, the case remains indefinitely

suspended without a final resolution. Statistics supplied by the Executive Office for Immigration Review ("EOIR") demonstrate that effect.

Since 1980, immigration judges have recalendared less than a third of administratively closed cases. Because the case comes off the active docket, the immigration judge no longer tracks it, and EOIR does not count the case as active in assessing backlogs in immigration proceedings. *See, e.g.,* Memorandum for All Immigration Judges, from Brian M. O'Leary, Chief Immigration Judge, EOIR, *Re: Operating Policies and Procedures Memorandum 13-01: Continuances and Administrative Closure* at 2–3 (Mar. 7, 2013) ("OPPM 13-01"). Administratively closed cases are also difficult to recalendar. The Department of Homeland Security ("DHS") may not know when the reason for the suspension (such as the pendency of a collateral proceeding) has been resolved. Even where DHS moves to recalendar, the Board has imposed the burden of persuasion on the movant. *W-Y-U-*, 27 I&N Dec. at 18 & n.4. And the alien respondent in most cases has few incentives to seek to recalendar because "as a general matter, every delay works to the advantage of the deportable alien who wishes merely to remain in the United States." *INS v. Doherty*, 502 U.S. 314, 323 (1992).

The practice of administrative closure has grown dramatically as the Board has made administrative closure easier to obtain. Statistics maintained by EOIR reveal that over three decades, from EOIR Fiscal Year 1980 to Fiscal Year 2011, 283,366 cases were administratively closed. But in a mere six years, from October 1, 2011 through September 30, 2017, immigration judges and the Board ordered administrative closure in 215,285 additional cases, nearly doubling the total number of cases subjected to administrative closure.

This sharp increase tracks changes in Board precedent. For decades, the immigration judge would grant administrative closure only if both parties agreed. In its 2012 *Avetisyan* decision, however, the Board discarded that principle and authorized administrative closure even over a party's objection. 25 I&N Dec. at 694, 696. After the *Avetisyan* test proved unwieldy, the Board recently "clarif[ied]" that the deciding factor should be "whether the party opposing administrative closure has provided a persuasive reason for the case to proceed and be resolved on the merits." *W-Y-U-*, 27 I&N Dec. at 20 (emphasis added).

This certified case illustrates but one example of how administrative closure encumbers the fair and efficient administration of immigration cases. The respondent entered this country illegally in 2014 and was immediately detained. As an unaccompanied minor, he was served with a Notice to Appear and released to a relative after providing the address where they would reside. Despite several efforts to notify the respondent of his hearing dates, he repeatedly failed to appear. The Immigration Judge nonetheless

continued this case four times and finally ordered the case administratively closed on the ground that DHS had not shown it had a sufficiently reliable address to provide adequate notice.

On appeal, the Board vacated the Immigration Judge's administrative closure order and remanded. DHS represents that this certified case is one of nearly 200 decisions between April 2017 and December 2017 in which an immigration judge either ordered administrative closure or refused to recalendar an administratively closed case over DHS's objection. Brief for DHS at 10–11, *Castro-Tum*, 27 I&N Dec. 187 (A.G. 2018).

For the reasons stated below, I affirm the Board's November 27, 2017 order and hold that there is no general authority for administrative closure. Immigration judges exercise only the authority provided by statute or delegated by the Attorney General. Congress has never authorized administrative closures in a statute, and Department of Justice regulations only permit administrative closure in specific categories of cases. The Attorney General has never delegated the general authority, and I decline to do so now. Cases that have been administratively closed absent a specific authorizing regulatory provision or judicially approved settlement shall be recalendared upon motion of either party. I overrule all Board precedents inconsistent with this opinion and remand for further proceedings.

## I.

I begin with the history of administrative closure. Although no statute delegates to immigration judges or the Board the authority to order administrative closure, they have employed the practice to halt immigration proceedings indefinitely since at least the early 1980s. During that time, some regulations have authorized or required administrative closure, but only in limited circumstances.

## A.

In 1984, the Chief Immigration Judge instructed immigration judges to consider administrative closure as one means of addressing the "recurring problem" of respondents' failure to appear at hearings. Memorandum for All Immigration Judges, from William R. Robie, Chief Immigration Judge, EOIR, Re: Operating Policy and Procedure 84-2: *Cases in Which Respondents/Applicants Fail to Appear for Hearing* at 1–2 (Mar. 7, 1984). The Chief Immigration Judge did not identify any basis for this authority. Nonetheless, immigration judges and the Board soon employed administrative closure in all types of removal proceedings. By 1988, the

Board described the practice as an "administrative convenience." *Matter of Amico*, 19 I&N Dec. 652, 654 n.1 (BIA 1988).

Between 1988 and 2012, Board precedent held that an immigration judge could grant administrative closure only where both parties supported the request. *See*, *e.g., Matter of Lopez-Barrios*, 20 I&N Dec. 203, 204 (BIA 1990); *Matter of Gutierrez-Lopez*, 21 I&N Dec. 479, 480 (BIA 1996). These decisions again assumed without explanation that immigration judges and the Board possessed this general authority.

In 2012, *Avetisyan* significantly expanded the practice, holding for the first time that an immigration judge could administratively close a case over the objection of one party. 25 I&N Dec. at 694. The Board premised this authority on the immigration judge's power to "regulate the course of the hearing" and to take any action that is "appropriate and necessary for the disposition of such cases." Id. at 691 (citing 8 C.F.R. §§ 1003.10(b) & 1240.1(a)(1)(iv), (c)). The Board specified that an immigration judge considering a motion for administrative closure over one party's objection should consider the following six factors:

> (1) the reason administrative closure is sought; (2) the basis for any opposition to administrative closure; (3) the likelihood the respondent will succeed on any [relief] he or she is pursuing outside of removal proceedings; (4) the anticipated duration of the closure; (5) the responsibility of either party, if any, in contributing to any current or anticipated delay; and (6) the ultimate outcome of removal proceedings . . . when the case is recalendared.

*Id*. at 696.

Recently, in *W-Y-U-*, the Board "clarif[ied]" the six-factor *Avetisyan* test and held that the "primary consideration for an Immigration Judge" in determining whether to administratively close a case over a party's objection is "whether the party opposing administrative closure has provided a persuasive reason for the case to proceed and be resolved on the merits." 27 I&N Dec. at 20 & n.5. The Board also concluded that, after a case has been administratively closed, the party moving to have the case recalendared must likewise show a "persuasive reason" to do so. *Id*. at 18 & n.4, 20.

Within the last few years, both the Chief Immigration Judge and DHS issued policy memoranda promoting administrative closure. In 2013, the Chief Immigration Judge instructed immigration judges that "[a]dministrative closure is a legitimate method of removing a case from the court's active docket, and preserving limited adjudicative resources." OPPM 13-01 at 2; see also Memorandum for All Immigration Judges, from Brian

M. O'Leary, Chief Immigration Judge, EOIR, Re: *Operating Policies and Procedures Memorandum 15-01: Hearing Procedures for Cases Covered by New DHS Priorities and Initiatives* at 3 (Apr. 6, 2015) ("*OPPM* 15-01") ("Judges are encouraged to use the docketing tools available to them to ensure the fair and timely resolution of cases before them. That includes continuances, termination[,] and administrative closure in appropriate cases.").

From 2011 to early 2017, DHS used administrative closure as a way to decline to prosecute low priority cases without formally terminating them. *See* Memorandum for All Chief Counsel, Office of the Principal Legal Advisor, from Peter S. Vincent, Principal Legal Advisor, U.S. Immigration and Customs Enforcement, *Re: Case-by-Case Review of Incoming and Certain Pending Cases* at 2 (Nov. 17, 2011) (identifying administrative closure as a mechanism for exercising prosecutorial discretion); Memorandum for Office of the Principal Legal Advisor Attorneys, from Riah Ramlogan, Acting Principal Legal Advisor, U.S. Immigration and Customs Enforcement, *Re: Guidance Regarding Cases Pending Before EOIR Impacted by Secretary Johnson's Memorandum entitled* Policies for the Apprehension, Detention and Removal of Undocumented Immigrants at 2 (Apr. 6, 2015) (directing DHS attorneys to "generally seek administrative closure or dismissal of cases [DHS] determines are not priorities"). Last year, DHS issued revised guidance making clear that "[e]xcept as specifically noted . . . , [DHS] no longer will exempt classes or categories of removable aliens from potential enforcement." Memorandum for Kevin McAleenan, Acting Commissioner, U.S. Customs and Border Protection, et al., from John Kelly, Secretary of Homeland Security, Re: *Enforcement of the Immigration Laws to Serve the National Interest* at 2 (Feb. 20, 2017).

B.

Until 1998, Department of Justice regulations did not mention administrative closure. Over the next several years, the Attorney General—through EOIR and the Immigration and Naturalization Service ("INS")—issued a series of regulations that authorized or mandated administrative closure, but only in a defined set of cases. None of these regulations delegated general authority to authorize administrative closure.

In 1999, the Attorney General promulgated regulations to implement a settlement agreement providing that removal proceedings for certain Guatemalan and Salvadoran nationals would be administratively closed or continued until they "had the opportunity to effectuate [their] rights under [the] agreement." *American Baptist Churches v. Thornburgh*, 760 F. Supp.

796, 805 (N.D. Cal. 1991); see 8 C.F.R. §§ 1240.62(b)(1)(i), (2)(iii), 1240.70(f)–(h).[1]

Similarly, between 1998 and 2003, the Department promulgated regulations requiring administrative closure in certain cases where aliens pursue statutory procedures to avoid removal. In 1998, Department regulations mandated administrative closure of removal proceedings involving certain Nicaraguan or Cuban nationals. *See* 8 C.F.R. § 1245.13(d)(3)(i) (stating that immigration judges or the Board "shall, upon request of the alien and with the concurrence of [DHS], administratively close the proceedings, or continue indefinitely the motion [to reopen the proceedings], to allow the alien to file [an] application" for adjustment of status).[2]

Regulations issued in 1999 likewise require administrative closure in cases involving specified Haitian nationals in removal proceedings. *E.g., id.* § 1245.15(p)(4)(i) (mandating administrative closure for any Haitian national who seeks to file an application for adjustment of status and "appears to be eligible" for such relief, if DHS "concur[s]" in administrative closure). And regulations issued in 2003 authorize certain nationals of Vietnam, Cambodia, and Laos to move for administrative closure pending their applications for adjustment of status, but prevent the immigration judge or the Board from "defer[ring] or dismiss[ing] the proceeding" without DHS's consent. *Id.* § 1245.21(c).

In 2000, the Legal Immigration Family Equity ("LIFE") Act authorized the spouses and children of permanent residents to live and work in the United States while waiting to obtain "V nonimmigrant" status. Pub. L. No. 106-553, tit. XI, 114 Stat. 2762, 2762A-142. EOIR's 2001 implementing regulation provides that eligible aliens "should request before the immigration judge or the Board of Immigration Appeals . . . that the proceedings be administratively closed . . . in order to allow the alien to pursue an application for V nonimmigrant status." 8 C.F.R. § 1214.3. The immigration judge or the Board "shall administratively close the proceeding" if the alien "appears eligible for V nonimmigrant status." *Id.*

Another 2000 statute, the Victims of Trafficking and Violence Prevention Act, allows victims of human trafficking to obtain immigration relief through

---

[1] The Department of Justice also agreed to a settlement agreement in *Barahona-Gomez v. Ashcroft*, 243 F. Supp. 2d 1029 (N.D. Cal. 2002), which required immigration judges and the Board to administratively close class members' cases. *Id.* at 1035–36. EOIR's regulations do not address this agreement.

[2] The regulations further instructed immigration judges or the Board to "terminate[]" the case if the application for adjustment of status is granted, 8 C.F.R. § 1245.13(l), and to "recalendar" the case upon a motion by DHS if the application is denied, *id.* § 1245.13(m)(1)(ii).

the "T nonimmigrant" category.  Pub. L. No. 106-386, § 107, 114 Stat. 1464, 1474–1480.  EOIR's 2002 implementing regulation provides that "a victim of a severe form of trafficking" who intends to apply for T nonimmigrant status may, "[w]ith the concurrence of [DHS] counsel . . . request that [removal] proceedings be administratively closed . . . in order to allow the alien to pursue an application for T nonimmigrant status."  8 C.F.R. § 1214.2(a).  Furthermore, "[i]f the alien appears eligible for T nonimmigrant status, the immigration judge or the Board . . . may grant such a request to administratively close the proceeding."  *Id.*[3]

In sum, these regulations limit administrative closure authority to specific categories of cases, but do not delegate the general authority to authorize administrative closure.

## II.

## A.

In this case, an immigration judge ordered administrative closure over DHS's objection.  The respondent, a citizen of Guatemala, entered the United States around June 26, 2014, when he was seventeen years old.  The U.S. Border Patrol apprehended him on that day.  He provided the Border Patrol with the United States address where he planned to live with his sponsor, who was his brother-in-law.  DHS designated the respondent an unaccompanied alien child and placed him in the custody of the Department

---

[3] After INS's functions transferred to DHS, most of the regulations discussed in this subsection were duplicated to apply to both the Department of Justice and DHS.  *E.g.,* Aliens and Nationality; Homeland Security; Reorganization of Regulations, 68 Fed. Reg. 9824, 9836 (Feb. 28, 2003).  But some regulations under the LIFE Act relating to administrative closure appear applicable only to DHS, since they were not recodified as EOIR regulations.  *E.g.,* 8 C.F.R. § 245a.12(b)(1)–(2) (mandating administrative closure under certain circumstances pending the filing of a LIFE Legalization application).  There is also a 2013 DHS regulation discussing administrative closure that has no corollary in Department of Justice regulations.  It provides that an alien whose case is administratively closed may be eligible for a provisional unlawful presence waiver, which may streamline the immigration process for spouses or immediate relatives of U.S. citizens who must process their entry through a U.S. consulate or embassy abroad.  8 C.F.R. § 212.7(e)(4)(iii).  If the case is recalendared, however, eligibility disappears.  *Id.*  Regulations that apply only to DHS do not provide authorization for an immigration judge or the Board to administratively close or terminate an immigration proceeding.

of Health and Human Services' Office of Refugee Resettlement ("HHS-ORR").[4]

On June 28, 2014, DHS commenced removal proceedings by personally serving the respondent with a Notice to Appear. The notice reflected the mailing address that he had provided to the Border Patrol at the time of his apprehension and informed him of his responsibility to update his mailing address if it changed. The notice also ordered the respondent to appear before an immigration judge at a specified address on "a date to be set at a time to be set."

On August 20, 2014, HHS-ORR released the respondent to the custody of his brother-in-law. Before release, HHS-ORR must confirm the child's future address. Office of Refugee Resettlement, Sponsor Handbook at 7 (Rev. May 31, 2017) https://www.acf.hhs.gov/sites/default/files/orr/5_31_17_sponsor_english_h andbook_003.pdf. Furthermore, the sponsor must agree to ensure the child's attendance at future immigration proceedings and receives a "Verification of Release Form" listing the address where the sponsor and child will reside. This form constitutes evidence that the sponsor is "housing the minor at the address reflected on the form." *Id.* at 8. Here, the respondent identified his future address as the same address given to the Border Patrol upon his apprehension. HHS-ORR's Release Notification confirmed that "the [r]espondent and [s]ponsor w[e]re notified that they must inform [the] Immigration Court directly of any further change of address."

---

[4] An unaccompanied alien child is a child who has no lawful immigration status in the United States, has not attained eighteen years of age, and has no parent or legal guardian in the United States, or no parent or guardian in the United States available to provide care and physical custody. *See* 6 U.S.C. § 279(g)(2); 8 U.S.C. § 1232(g). The respondent entered the United States alone and stated that he was born on January 10, 1997; based on that birthdate, he entered the United States prior to his eighteenth birthday, and DHS designated him an unaccompanied alien child. An alien who does not meet the statutory definition of an unaccompanied alien child is not entitled to that status. *See* Memorandum for James R. McHenry III, Acting Director, EOIR, from Jean King, General Counsel, EOIR, *Re: Legal Opinion re: EOIR's Authority to Interpret the Term Unaccompanied Alien Child for Purposes of Applying Certain Provisions of TVPRA* at 6–9 (Sept. 19, 2017); cf. 8 U.S.C. § 1232(c)(2)(B) (individuals previously designated as unaccompanied alien children may be transferred to DHS custody once they "reach[] 18 years of age"). It is unclear whether the respondent's brother-in-law was his legal guardian, such that the respondent would have ceased to qualify as an unaccompanied alien when his brother-in-law assumed custody on August 20, 2014. At a minimum, however, the respondent ceased to qualify as an unaccompanied alien child on January 10, 2015, his eighteenth birthday, two days after his first hearing date.

On November 26, 2014, the Immigration Judge mailed the first Notice of Hearing to the respondent at that address. The respondent did not appear. The Immigration Judge scheduled four more hearings. Before each one, the Immigration Judge mailed a Notice of Hearing to this same address. The U.S. Postal Service did not return any of the notices as undeliverable. The respondent, however, did not appear at any hearing.

Nonetheless, at each of the four hearings, the Immigration Judge declined to proceed *in absentia*. At the respondent's first hearing, on January 8, 2015, the Immigration Judge cited the respondent's failure to appear as the basis for granting a continuance.[5] At the second hearing, on April 2, 2015, the Immigration Judge again granted a continuance, recording the same ground. At the third hearing, on October 8, 2015, the Immigration Judge granted another continuance, this time on the ground that DHS was not available for the hearing.

At the respondent's fourth hearing, on January 14, 2016, the Immigration Judge considered the respondent's case along with others involving unaccompanied alien children. The Immigration Judge expressed concerns about the adequacy of the hearing notices in these cases, because in some other cases, the notices had been returned to sender. After DHS requested more time to identify correct addresses in the cases that involved returned notices, the Immigration Judge granted continuances across the board, and later explained that this was his practice whenever an unaccompanied alien child fails to appear.

At the respondent's fifth hearing, on April 18, 2016, the Immigration Judge ordered administrative closure of the respondent's case and of ten other cases in which the respondents had repeatedly failed to appear. The Immigration Judge stated that he did not view HHS-ORR addresses as reliable and would not proceed in absentia unless the government provided "further documentation . . . as to how that address was secured, who furnished it, who is verifying it." In the respondent's case, DHS demonstrated that HHS-ORR had obtained the relevant address from the respondent in multiple forms, and provided additional proof that the mailing address did not contain errors. Nonetheless, the Immigration Judge ordered the case administratively closed.

On November 27, 2017, the Board vacated the order and remanded with a direction to calendar a new hearing and to proceed *in absentia* if the

---

[5] Immigration court dockets include codes reflecting the reason for adjournment associated with each hearing date. *See EOIR, The 180-day Asylum EAD Clock Notice* (May 9, 2017) (including codes effective January 30, 2015), https://www.uscis.gov/sites/default/files/USCIS/Humanitarian/Refugees%20%26%20Asylum/Asylum/Asylum_Clock_Joint_Notice_-_revised_05-10-2017.pdf.

respondent again did not appear. The Board noted that when a respondent fails to appear, section 240(b)(5)(A) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1229a(b)(5)(A), requires the immigration judge to order removal in absentia if DHS clearly establishes removability and the adequacy of the notice. The Board held that the Immigration Judge had erred by ordering the case administratively closed based on purportedly deficient notice. Instead, the Board held, notice was adequate because DHS had personally served the respondent with the Notice to Appear and sent the Notices of Hearing to the address listed in the respondent's HHS-ORR Release Notification. The Board explained that the Immigration Judge's concerns about how HHS-ORR obtains addresses failed to assess each case "on its own particular circumstances and facts," and failed to presume that officials "properly discharged their official duties."

## B.

On January 4, 2018, I certified this case for my review and stayed the Board's decision pending that review. I requested briefing from the parties and any interested amici on points relevant to the disposition of this case, including (1) whether immigration judges or the Board have the authority to order administrative closure; (2) whether I should delegate or withdraw such authority; (3) whether administrative closure is or should be different from other docket management devices; and (4) if immigration judges or the Board lack the authority to order administrative closure, what actions should be taken regarding cases that are already administratively closed. *Castro-Tum*, 27 I&N Dec. at 187.

My authority to certify this case and to resolve these issues through adjudication is well-established. Under the INA, "[t]he Attorney General enjoys broad powers with respect to 'the administration and enforcement of [the INA itself] and all other laws relating to the immigration and naturalization of aliens.'" *Blanco de Belbruno v. Ashcroft*, 362 F.3d 272, 279 (4th Cir. 2004) (quoting INA § 103(a)(1), 8 U.S.C. § 1103(a)(1) (2000)); *Matter of D-J-*, 23 I&N Dec. 572, 573–74 & n.2 (A.G. 2003). The INA further grants me the authority to "establish such regulations, . . . issue such instructions, review such administrative determinations in immigration proceedings, delegate such authority, and perform such other acts as the Attorney General determines to be necessary for carrying out" the duty to oversee all law related to the immigration and naturalization of aliens. INA § 103(g)(2), 8 U.S.C. § 1103(g)(2). That authority includes the power to certify Board decisions for my review. 8 C.F.R. § 1003.1(h)(1) (describing the certification procedure).

When exercising my authority to oversee immigration law, I may choose between rulemaking or adjudication.  "[T]he choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency."  *SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947); *see NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294 (1974).  Some previous Attorneys General have preferred to resolve questions of immigration law through rulemaking.  *See Matter of Compean*, 25 I&N Dec. 1, 2 (A.G. 2009) (reversing a prior Attorney General opinion and ordering as-yet-unfinished rulemaking to resolve the issue).  Others have resolved significant questions by certifying immigration decisions.  *E.g., Matter of R-A-*, 24 I&N Dec. 629, 630–31 (A.G. 2008) (ordering the Board to proceed with adjudications that a prior Attorney General opinion had stayed pending a never-finalized rulemaking).  I have concluded that adjudication presents a more efficient, but equally thorough, means of considering the legal basis for the practice of administrative closure.

After certifying this case, I received a party submission from DHS and fourteen amicus briefs spanning over five hundred pages.  DHS and one amicus argue that no statute or regulation authorizes general administrative-closure authority.  Most other amici contend that immigration judges and the Board implicitly possess this authority, relying upon regulations establishing the general powers of immigration judges and the Board, regulations expressly delegating administrative closure authority in some circumstances, and adjudicators' inherent authority.

"I review de novo all aspects of the Board's and the Immigration Judge's decisions in this case."  *Matter of J-F-F-*, 23 I&N Dec. 912, 913 (A.G. 2006).  Furthermore, Congress has provided that "determination[s] and ruling[s] by the Attorney General with respect to all questions of law," i.e., all questions of law arising under the INA and "all other laws relating to the immigration and naturalization of aliens," "shall be controlling."  INA § 103(a)(1), 8 U.S.C. § 1103(a)(1); *see also D-J-*, 23 I&N Dec. at 573–74 & n.2.  Thus, this published decision is binding on the Board and will overrule any Board decision with which it is inconsistent.  *See Matter of Jean*, 23 I&N Dec. 373, 374 n.3 (A.G. 2002).

## III.

Immigration judges and the Board have come to rely upon administrative closure without thoroughly explaining their authority to do so.  Unlike the power to grant continuances, which the regulations expressly confer, immigration judges and the Board lack a general authority to grant administrative closure.  No Attorney General has delegated such broad

authority, and legal or policy arguments do not justify it. I therefore hold that immigration judges and the Board lack this authority except where a previous regulation or settlement agreement has expressly conferred it.

### A.

As noted above, the INA vests the Attorney General with the supervision of immigration proceedings. Pursuant to the INA and Attorney General regulations, the immigration judges and the Board administer that system. However, these individuals exercise only the authority provided by statute or delegated by the Attorney General. As the courts of appeals have recognized, "there is no statutory basis for administrative closures. Nor is there any regulatory basis for administrative closures." *Diaz-Covarrubias v. Mukasey*, 551 F.3d 1114, 1118 (9th Cir. 2009); *Hernandez v. Holder*, 579 F.3d 864, 877 (8th Cir. 2009) (same), vacated in part, 606 F.3d 900 (8th Cir. 2010); accord *Gonzalez-Caraveo v. Sessions*, 882 F.3d 885, 889 (9th Cir. 2018) ("Although [administrative closure] is regularly used, it is not described in the immigration statutes or regulations."); *Vahora v. Holder*, 626 F.3d 907, 917 (7th Cir. 2010) ("[A]dministrative closure is not a practice specified in the statute, nor is it mentioned in the current regulations."). Therefore, I must consider whether immigration judges or the Board possess the authority of administrative closure based on the general powers conferred on them or on their inherent authority to decide cases.

### 1.

The INA provides that immigration judges "shall conduct proceedings for deciding the inadmissibility or deportability of an alien," INA § 240(a)(1), 8 U.S.C. § 1229a(a)(1), and "shall be subject to such supervision and shall perform such duties as the Attorney General shall prescribe," INA § 101(b)(4), 8 U.S.C. § 1101(b)(4). Immigration judges may "exercise the powers and duties delegated to them by the [INA] and by the Attorney General through regulation," and "shall be governed by the provisions and limitations prescribed by the [INA]" and relevant regulations and Board decisions. 8 C.F.R. § 1003.10(b), (d); *see also Lopez-Telles v. INS*, 564 F.2d 1302, 1304 (9th Cir. 1977); *Deportation Proceedings for Joseph Patrick Thomas Doherty*, 12 Op. O.L.C. 1, 3–4 (1988). Similarly, the Board is "a regulatory creature of the Attorney General, to which he has delegated much of his authority under the applicable statutes." *Doherty*, 502 U.S. at 327. The Board's authority is limited to "the review of those administrative adjudications under the Act that the Attorney General may by regulation assign to it," 8 C.F.R. § 1003.1(d)(1), and the Board is "governed by the

provisions and limitations prescribed by applicable law, regulations, and procedures, and by decisions of the Attorney General," *id*. § 1003.1(d)(1)(i).

The parties and amici agree that no statute or regulation explicitly delegates general administrative-closure authority. Instead, the Board in *Avetisyan* and some amici infer such a delegation from regulations authorizing immigration judges or the Board, in deciding cases, to "exercise their independent judgment and discretion and . . . take any action consistent with their authorities under the [INA] and regulations that is appropriate and necessary for the disposition of such cases." 8 C.F.R. § 1003.10(b) (immigration judges); *id*. § 1003.1(d)(1)(ii) (the Board; similar). Notably, these authorities do not stand alone. After recognizing that immigration judges may take appropriate and necessary actions, section 1003.10(b) identifies a list of powers, such as "administer[ing] oaths," "receiv[ing] evidence," examining witnesses, and issuing administrative subpoenas. The section concludes with the direction that "[i]n all cases, immigration judges shall seek to resolve the questions before them in a *timely* and impartial manner consistent with the [INA] and regulations." *Id*. § 1003.10(b) (emphasis added). Section 1003.1(d)(1)(ii), which applies to the Board, contains a parallel direction.

Most courts have interpreted section 1003.10(b) to confer on immigration judges "a reasonable degree of latitude in conducting . . . proceedings." *Ramirez-Durazo*, 794 F.2d 491, 496 (9th Cir. 1986); *see, e.g., Jeronimo v. U.S. Att'y Gen*, 678 F. App'x 796, 804 (11th Cir. 2017) (immigration judges' express authority to "receive" evidence includes the authority to accept evidence into the record and weigh its evidentiary value); *Ramirez-Durazo*, 794 F.2d at 496 (immigration judges' express authority to conduct hearings extends to conducting joint hearings).[6] But courts have not identified the adoption of procedures to indefinitely suspend the adjudication as part of that latitude.

---

[6] In *Baez-Sanchez v. Sessions*, 872 F.3d 854 (7th Cir. 2017), the Seventh Circuit interpreted 8 C.F.R. § 1003.10(b) as "a declaration that [immigration judges] may exercise all of the Attorney General's powers 'in the cases that come before them', unless some other regulation limits that general delegation." *Id*. at 855. That interpretation is inconsistent with the regulatory text, which limits immigration judges to authorities that are "appropriate and necessary" to resolving cases in a manner consistent with existing statutes and regulations, rather than authorizing novel tools for adjudication. That interpretation would also render superfluous other specific grants of authority, such as regulations authorizing the granting of continuances, 8 C.F.R. § 1003.29, or authorizing administrative closure for qualifying nationals of particular countries and other types of aliens, 8 C.F.R. §§ 1245.13 (qualifying nationals of Nicaragua and Cuba), 1245.15 (qualifying nationals of Haiti), 1245.21 (qualifying nationals of Vietnam, Cambodia, and Laos), 1214.2 (T nonimmigrant status), 1214.3 (V nonimmigrant status).

Courts have similarly held that the Board's parallel authority under section 1003.1(d)(1)(ii) does not "expressly or impliedly" grant "plenary power[s]." *Sosa-Valenzuela v. Gonzales*, 483 F.3d 1140, 1146–47 (10th Cir. 2007). Rather, section 1003.1(d)(1)(ii) grants the Board the discretion to take actions consistent with reviewing appeals such as deciding questions not expressly raised, accepting untimely briefs, and correcting obvious omissions in an immigration judge's order. *E.g., Desta v. Ashcroft*, 329 F.3d 1179, 1185 (10th Cir. 2003) (immigration judge's failure to designate a country of deportation); *Getachew v. INS*, 25 F.3d 841, 845 (9th Cir. 1994) (late briefs); *Vargas-Ceja v. Mukasey*, 301 F. App'x 652, 653 (9th Cir. 2008) (deciding questions "not specifically raised on appeal").

Neither section 1003.10(b) nor section 1003.1(d)(1)(ii) confers the authority to grant administrative closure. Grants of general authority to take measures "appropriate and necessary for the disposition of such cases" would not ordinarily include the authority to suspend such cases indefinitely. Administrative closure in fact is the antithesis of a final disposition. These provisions further direct immigration judges or the Board to resolve matters "in a timely fashion"—another requirement that conflicts with a general suspension authority.

The Board in *Avetisyan* also relied upon section 1240.1(a), which identifies the jurisdiction of immigration judges in removal proceedings. 25 I&N Dec. at 691, 694. The first three clauses of subsection (a)(1) provide that the judge may "[d]etermine removability," resolve applications under particular statutes, and "order withholding of removal." 8 C.F.R. § 1240.1(a)(1)(i)–(iii). The fourth clause adds that immigration judges may "take any other action consistent with applicable law and regulations as may be appropriate." 8 C.F.R. § 1240.1(a)(1)(iv). As part of a series of provisions specifying immigration judges' jurisdiction, that phrase may grant authority to issue final orders in analogous matters. *See Atunnise v. Mukasey*, 523 F.3d 830, 839 (7th Cir. 2008) (referring to the phrase as a "catchall" jurisdictional authority); *see also Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 575 (1995) ("[A] word is known by the company it keeps (the doctrine of noscitur a sociis). This rule we rely upon to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words."). That provision does not concern the authority to make procedural rulings within the proceeding, such as the granting of administrative closure.

Nor is section 1240.1(c) a source of administrative-closure authority. That provision recognizes that in conducting hearings, immigration judges may "receive and consider material and relevant evidence, rule upon objections, and otherwise regulate the course of the hearing." 8 C.F.R. § 1240.1(c). The last phrase—"otherwise regulate the course of the hearing"—provides general authority in connection with the presentation of argument

and evidence. *E.g., Champion v. Holder*, 626 F.3d 952, 957–58 (7th Cir. 2010) (section 1240.1(c) allows immigration judges to refuse to allow closing arguments); *Pulisir v. Mukasey*, 524 F.3d 302, 311 (1st Cir. 2008) (section 1240.1(c) grants authority to exclude testimony from witnesses with no personal knowledge of facts). Again, it does not entail an authority to grant an indefinite suspension.[7]

Regulations also grant the Chief Immigration Judge and the Chairman of the Board the authority to manage dockets. Subject to the supervision of the Director of EOIR, both administrators may "[i]ssue operational instructions and policy." 8 C.F.R. § 1003.9(b)(1) (Chief Immigration Judge); id. § 1003.1(a)(2)(i)(A) (Chairman). They have the power "to set priorities or time frames for the resolution of cases, to direct that the adjudication of certain cases be deferred, to regulate the assignment of [immigration judges or Board members] to cases, and otherwise to manage the docket of matters to be decided by" the immigration judges or the Board. 8 C.F.R. § 1003.9(b)(3) (Chief Immigration Judge); *id.* § 1003.1(a)(2)(i)(C) (Chairman). These regulations grant no express authority to administratively close cases, and cannot reasonably be interpreted to implicitly delegate such authority. They permit only more limited actions, like delaying the scheduling of certain cases to prioritize others.[8]

In all events, the Chief Immigration Judge and the Chairman of the Board have never purported to "direct that the adjudication of certain cases be deferred" by authorizing individual immigration judges or Board members to exercise a general administrative-closure authority. To the extent that past memoranda have mentioned administrative closure, they have simply assumed—based on Board precedent—that the authority exists. *See, e.g., OPPM* 15-01 at 3 (advising that "[j]udges are encouraged to use the docketing tools available to them," including "administrative closure in appropriate cases"); *OPPM 13-01* at 2 ("[r]equests for administrative closure . . . should be granted in appropriate circumstances" since "[a]dministrative closure is a legitimate method of removing a case from the court's active docket, and preserving limited adjudicative resources"). Decades of Board precedents further undercut the notion that the Chief Immigration Judge or Chairman of the Board have authorized administrative closure. Notably, *Avetisyan* did not rely upon section 1003.9(b)(1) or 1003.1(a)(2)(i)(A), but

---

[7] The Board in *Avetisyan* also cited 8 C.F.R. § 1003.14(a) for the proposition that jurisdiction vests upon the filing of a notice to appear. 25 I&N Dec. at 694. But that provision is not an independent source of authority for administrative closure; it merely reflects when jurisdiction vests. 8 C.F.R. § 1003.14(a).

[8] Moreover, section 1003.9(b)(1) did not grant the Chief Immigration Judge the authority to defer adjudications or otherwise manage dockets until 2007, so it cannot justify a practice that immigration judges have employed since the 1980s.

instead invoked regulations delegating general powers to immigration judges or the Board.   25 I&N Dec. at 691 (citing 8 C.F.R. §§ 1003.10(b), 1240.1(a)(1)(iv), (c)).

In the course of reviewing Board decisions involving administrative closure, federal courts have assumed that immigration judges and the Board have such authority.  In *Gonzalez-Caraveo*, for instance, the Ninth Circuit relied upon *Avetisyan* and identified section 1003.1(d)(1)(ii) and section 1003.10(b) as sources of this putative power.  882 F.3d at 890–91.  That opinion, however, is best read as merely restating the Board's reasoning in *Avetisyan* rather than independently parsing the regulations.  In fact, the Ninth Circuit in *Gonzalez-Caraveo* relied upon its previous decision in Diaz-Covarrubias, which explicitly stated that administrative closure had "no statutory basis" and no "regulatory basis."  *Id*. at 889, 891–92.  Other federal courts have similarly assumed the existence of this authority and applied the Board's existing standards.  *E.g., Tello-Espana v. Sessions*, 712 F. App'x 554, 557–58 (6th Cir. 2017); *Hernandez-Castillo v. Sessions*, 875 F.3d 199, 207, 209 (5th Cir. 2017); *Gonzalez-Vega v. Lynch*, 839 F.3d 738, 740–42 (8th Cir. 2016); *Duruji v. Lynch*, 630 F. App'x 589, 592 (6th Cir. 2015); *Santos-Amaya v. Holder*, 544 F. App'x 209, 209 (4th Cir. 2013); *Vahora*, 626 F.3d at 914–15, 919–20.  But no federal court has analyzed the regulations in detail, much less held that they unambiguously confer such authority.  Accordingly, those decisions neither conflict with, nor diminish, my authority to interpret the relevant regulations here.  *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs*., 545 U.S. 967, 980 (2005); INA § 103(a)(1), 8 U.S.C. § 1103(a)(1) ("[D]etermination[s] and ruling[s] by the Attorney General with respect to all questions of law shall be controlling.").  I do not believe that the existing regulations offer a persuasive basis for inferring a delegation of the authority to administratively close cases.[9]

2.

Interpreting the existing regulations to provide a general authority to grant administrative closure would also make the specific delegations that Attorneys General have made in this area largely superfluous.  It is not

---

[9] DHS has promulgated a regulation that grants certain aliens with administratively closed cases eligibility to apply for a provisional waiver of inadmissibility.  *See supra* note 2; INA § 103(a)(1), 8 U.S.C. § 1103(a)(1).  Because only the Attorney General may expand the authority of immigration judges or the Board, that regulation cannot be an independent source of authority for administrative closure.  In all events, that regulation does not presuppose general administrative-closure authority because it still has force in all cases subject to administrative closure based on regulations that expressly and specifically authorize it for particular types of aliens.

consistent with this scheme to read it to confer sweeping implied authorities beyond those that prior Attorneys General have chosen to delegate. Such an interpretation would further conflict with the policies underlying the INA and the regulations that obligate immigration judges and the Board to resolve immigration matters expeditiously.

When my predecessors have delegated to immigration judges or the Board the authority to pause proceedings, they have done so by expressly and specifically granting such authority. For instance, as described above, EOIR regulations have expressly authorized or required administrative closure under a defined set of circumstances, such as where involving nationals of particular countries who are statutorily eligible to apply for certain relief. *See supra* pp. 4–5.

These instances of limited, express authorization reinforce the conclusion that no broad delegation of authority exists. *See Cont'l Cas. Co. v. United States*, 314 U.S. 527, 533 (1942) ("Generally speaking a 'legislative affirmative description' implies denial of the nondescribed powers."); *Botany Worsted Mills v. United States*, 278 U.S. 282, 289 (1929) ("When a statute limits a thing to be done in a particular mode, it includes the negative of any other mode."). Moreover, if the above regulations had delegated general authority to administratively close all types of cases, regulations like 8 C.F.R. § 1214.2(a), the provision specifying that immigration judges "may" administratively close certain cases involving human trafficking victims, would be superfluous. *See Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652, 1659 (2017) ("Our practice . . . is to 'give effect, if possible, to every clause and word of a statute.'" (quoting *Williams v. Taylor*, 529 U.S. 362, 404 (2000))); *Yates v. United States*, 135 S. Ct. 1074, 1085 (2015) (plurality opinion) ("We resist a reading of [the relevant statutory provision] that would render superfluous an entire provision passed in proximity as part of the same Act."); *see also Black & Decker Corp. v. Comm'r of Internal Revenue*, 986 F.2d 60, 65 (4th Cir. 1993) ("Regulations, like statutes, are interpreted according to canons of construction. Chief among these canons is the mandate that 'constructions which render regulatory provisions superfluous are to be avoided.'" (quoting *Hart v. McLucas*, 535 F.2d 516, 519 (9th Cir. 1976))). There would be no need to provide that immigration judges "may" administratively close specific cases if they already possessed the discretionary power to do so.

Likewise, regulations expressly confer the authority to grant continuances, the docket-management device that most resembles administrative closure. An immigration judge "may grant a motion for continuance for good cause shown." 8 C.F.R. § 1003.29; *see also* 8 C.F.R. § 1240.6 (an immigration judge "may grant a reasonable adjournment either at his or her own instance or, for good cause shown, upon application by the

respondent or [DHS]"). A continuance temporarily defers a case for a fixed period while it remains on the docket. But if general regulatory provisions already gave immigration judges the implicit power to suspend cases indefinitely through administrative closure, those same general authorizations would surely empower immigration judges to suspend cases for finite periods through continuances. And if immigration judges already possessed such authority, there would have been little point in expressly empowering immigration judges to grant continuances. *Cf. Rhodes-Bradford v. Keisler*, 507 F.3d 77, 80 (2d Cir. 2007) (rejecting the Board's asserted authority to issue removal orders in the first instance because "when the regulations confer upon [immigration judges] the power to issue removal orders, they do so quite explicitly"). I must adopt an interpretation that gives each regulation independent meaning, not one that renders the continuance regulation unnecessary. *See Advocate Health Care Network*, 137 S. Ct. at 1659; Yates, 135 S. Ct. at 1085.

In reaching this conclusion, I am mindful that the preambles to some regulations authorizing administrative closure for a narrow set of cases accept as a given that immigration judges and the Board have employed the practice more broadly. *Adjustment of Status for Certain Aliens from Vietnam, Cambodia, and Laos in the United States*, 67 Fed. Reg. 78667, 78669 (Dec. 26, 2002); *Adjustment of Status for Certain Nationals of Haiti*, 65 Fed. Reg. 15835, 15842 (Mar. 24, 2000). But these statements merely acknowledge then-existing Board precedent, and do not purport independently to confer such authority.[10]

Finally, interpreting these regulations to authorize the general administrative closure of cases would conflict with the policies underlying the INA and its implementing regulations. Under the INA, DHS has the exclusive authority to decide whether and when to initiate proceedings. *W-Y-U-*, 27 I&N Dec. at 19. Once DHS initiates proceedings, immigration judges and the Board must proceed "expeditious[ly]" to resolve the case. 8 C.F.R. § 1003.12; *see Matter of Roussis*, 18 I&N Dec. 256, 258 (BIA 1982) ("It has long been held that when enforcement officials of the Immigration and Naturalization Service [now DHS] choose to initiate proceedings against an alien and to prosecute those proceedings to a conclusion, the immigration judge is obligated to order deportation if the evidence supports a finding of deportability on the ground charged.").

---

[10] I am aware of no other evidence that previous Attorneys General delegated the general authority to administratively close cases, and the Board has never cited any such delegation. To the extent that any Attorney General could be viewed as having made such a delegation, I hereby exercise my discretion to revoke it because the practice of administrative closure thwarts the efficient and even-handed resolution of immigration proceedings.

These requirements reflect the "strong public interest in bringing litigation to a close as promptly as is consistent with the interest in giving the adversaries a fair opportunity to develop and present their respective cases." *INS v. Abudu*, 485 U.S. 94, 107 (1988); *see id.* at 107–08; 8 C.F.R. § 1003.10(b) ("In all cases immigration judges shall seek to resolve the questions before them in a timely and impartial manner consistent with the [INA] and regulations."). These requirements are also essential to the expeditious enforcement of our immigration laws. Delay virtually always operates to the detriment of the government. *See Doherty*, 502 U.S. at 323 ("[A]s a general matter, every delay works to the advantage of the deportable alien who wishes merely to remain in the United States."); *see also Stone v. INS*, 514 U.S. 386, 399–400 (1995) (similar). Yet, "an unreasonable delay in the resolution of the proceedings may operate to the detriment of aliens by preventing them from obtaining relief that can provide lawful status." *W-Y-U-*, 27 I&N Dec. at 20.

This certified case demonstrates how administrative closure particularly undermines the INA's mandate to swiftly adjudicate immigration cases when the respondent fails to appear. The INA unambiguously states that, with respect to in absentia proceedings, so long as DHS adequately alleges that it provided legally sufficient written notice to an alien, the alien "shall be ordered removed in absentia if [DHS] establishes by clear, unequivocal, and convincing evidence that the written notice was so provided and that the alien is removable." INA § 240(b)(5)(A), 8 U.S.C. § 1229a(b)(5)(A) (emphasis added); see also 8 C.F.R. § 1003.26. Section 240(b)(5) thus imposes an obligation to proceeding expeditiously to determine whether the requisite evidence supports the removal charge. *Lopez-Barrios*, 20 I&N Dec. at 204. Congress enacted this requirement "in response to a serious problem of aliens deliberately failing to appear for hearings and thus effectively extending their stay in this country." *Kaweesa v. Gonzales*, 450 F.3d 62, 68 (1st Cir. 2006); *see Arrieta v. INS*, 117 F.3d 429, 431 (9th Cir. 1997).[11] Accordingly, once DHS alleged that it provided adequate notice, the INA required the Immigration Judge to adjudicate the proceedings in absentia. Instead, the Immigration Judge ordered the case administratively closed because of his

---

[11] Section 242B, the original version of section 240(b)(5) of the INA, was codified at 8 U.S.C. § 1252b. See Immigration Act of 1990, Pub. L. No. 101-649, § 545(a), 104 Stat. 4978, 5061 (1990). In 1996, Congress struck section 242B and distributed its terms to other portions of the INA. *See* Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, § 308(b)(6), 110 Stat. 3009, 3009-615 (1996). The Notice to Appear and Notice of Hearing requirements were moved to INA § 239(a), 8 U.S.C. § 1229(a), and the mandatory *in absentia removal* language was moved, with no material modifications, to INA § 240(b)(5), 8 U.S.C. § 1229a(b)(5).

mistaken understanding of the notice required. Even if the respondent had received deficient notice, the proper course would have been to grant a continuance or terminate the proceedings, not to leave the case in limbo.[12]

3.

There is also no basis for inferring that immigration judges or the Board possess a general power to order administrative closure based on some inherent adjudicatory authority. The fact that federal district courts employ administrative closure as a docket-management tool to temporarily defer adjudication on the merits during the pendency of other proceedings does not justify the practice here. *Cf. Avetisyan*, 25 I&N Dec. at 690 n.2; *see generally CitiFinancial Corp. v. Harrison*, 453 F.3d 245, 250–51 (5th Cir. 2006) (noting that federal courts use administrative closure to defer cases when, for instance, there is a pending arbitration). As Article III courts, federal courts may possess inherent authority because of "the nature of their institution," which requires them to exercise powers "necessary to the exercise of all other[]" judicial powers even though such powers are "governed not by rule or statute." *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43 (1991) (internal quotation marks omitted); *see Ali v. Quarterman*, 607 F.3d 1046, 1049 (5th Cir. 2010) (grounding administrative-closure authority in federal courts'

---

[12] DHS adequately alleged that it provided sufficient notice because the Notice to Appear informed the respondent of all statutorily required information about the proceedings, and the subsequent Notice of Hearing included the date and time of proceedings. *See* INA § 240(b)(5)(A), 8 U.S.C. § 1229a(b)(5)(A); INA § 239(a)(1)(F)–(G), 8 U.S.C. § 1229(a)(1)(F)–(G). Taken together, the Notice to Appear and each Notice of Hearing contained all the statutorily required information. *See, e.g., Gomez-Palacios v. Holder*, 560 F.3d 354, 359 (5th Cir. 2009) (notice is satisfied by the combination of the Notice to Appear and Notice of Hearing). DHS also adequately alleged that the form of the notice was sufficient. DHS personally served the Notice to Appear on the respondent and mailed the Notice of Hearing to the address the respondent repeatedly provided the government. *See* INA § 240(b)(5)(A), 8 U.S.C. § 1229a(b)(5)(A); *Renaut v. Lynch*, 791 F.3d 163, 166–67 (1st Cir. 2015) (DHS enjoys a presumption of effective notice where it can demonstrate, via proof of attempted delivery, that notice was sent by regular mail to the address provided by the respondent). The fact that the respondent was a seventeen-year-old unaccompanied alien child at the time he received notice does not change this analysis. Service of notice for immigration proceedings on a responsible adult is only required "in the case of a minor under 14 years of age," 8 C.F.R. § 103.8(c)(2)(ii); its clear text is not altered by a separate regulatory statement providing for release of aliens under eighteen to an adult's custody, 8 C.F.R. § 1236.3. *See Lopez-Dubon v. Holder*, 609 F.3d 642, 645–46 (5th Cir. 2010); *Llapa-Sinchi v. Mukasey*, 520 F.3d 897, 899–901 (8th Cir. 2008); *Matter of Cubor-Cruz*, 25 I&N Dec. 470, 471–73 (BIA 2011). The Ninth Circuit has adopted a contrary view, *see Flores-Chavez v. Ashcroft*, 362 F.3d 1150, 1157–60 (9th Cir. 2004), but other courts have rightly rejected it as inconsistent with the regulatory text.

inherent powers). But immigration judges and the Board have no such inherent authority. They act on behalf of the Attorney General in adjudicating immigration cases, and can exercise only the specific powers that statutes or the Attorney General delegate. *See supra* p. 9.

Moreover, federal courts employ administrative closure much less frequently. Importantly, cases administratively closed in federal court remain on an inactive docket and can be recalendared upon either party's request or at the court's discretion. *CitiFinancial*, 453 F.3d at 250–51. Administratively closed cases in federal courts thus differ significantly from a "fully 'dismissed' case," which is "removed from the docket, terminated indefinitely, and restarted only upon the filing of a new complaint." *Id.* at 251. But the practice of administrative closure in immigration proceedings blurs this critical distinction. Immigration judges and the Board halt proceedings indefinitely, cease tracking the proceedings, and allow proceedings to resume only if the party seeking recalendaring satisfies the burden of demonstrating a good reason to resume proceedings. *See supra* p. 1; *see also W-Y-U-*, 27 I&N Dec. at 17–18 & n.4.

The fact that immigration judges and the Board have used administrative closure in a wide array of cases since the 1980s is also insufficient to establish the existence of that authority. As noted, immigration judges or the Board can exercise power only if the Attorney General delegates it. *See supra* p. 9. They cannot arrogate power to themselves by seizing it and relying on the Attorney General's lack of express disapproval.

B.

The current practice of administrative closure lacks a valid legal foundation, and I do not believe it would be appropriate to delegate such authority. Regulations already expressly authorize other mechanisms that serve the same functions, and those other mechanisms avoid many of the drawbacks of administrative closure. Cases that should not go forward should be terminated (either with or without prejudice), or dismissed, provided they meet the relevant legal standard. Unlike administrative closure, termination and dismissal ensure finality, cutting down on the number of cases orphaned within the immigration courts. Further, such actions encourage more accountability, by resulting in a final, transparent order from the immigration judge who ends the case. By contrast, administrative closure has produced a backlog all its own, with far fewer cases being recalendared than closed and some cases suspended for decades.

As discussed, for cases that truly warrant a brief pause, the regulations expressly provide for continuances. *See Duruji*, 630 F. App'x. at 592 ("[A]dministrative closure is akin to a continuance."). Unlike administrative

closure, however, continuances are for a fixed but potentially renewable period of time, and are granted upon a showing of "good cause." 8 C.F.R. § 1003.29. Continuances ensure that immigration cases do not get lost in the shuffle and will move forward once the circumstances warranting delay disappear. Immigration judges remain accountable for the proceedings, and the periods of delay are transparent. That is the appropriate way to deal with exceptional circumstances that legitimately warrant an exception to the fair and efficient administration of immigration laws.[13]

## IV.

For the reasons set forth above, I conclude that immigration judges and the Board lack the general authority to administratively close cases. Nonetheless, statistics maintained by EOIR show that at the end of Fiscal Year 2017, some 355,835 administratively closed cases had yet to be recalendared. A small proportion of those cases have been closed pursuant to regulations expressly authorizing administrative closure in particular cases or pursuant to court-approved settlements. *See* 8 C.F.R. §§ 1214.2(a), 1214.3, 1245.13(d)(3)(i), 1245.15(p)(4)(i), 1245.21(c), 1240.62(b), 1240.70(f)–(h); *Barahona-Gomez*, 243 F. Supp. 2d 1029; *ABC*, 760 F. Supp. 796. All of these cases should continue to proceed in the manner directed by the relevant regulations or settlement agreements.

In the other administratively closed cases, immigration judges and the Board ordered administrative closure without the authority to do so. I am cognizant of the need to return these cases to the active docket so that these matters can proceed expeditiously. Requiring recalendaring of all of these cases immediately, however, would likely overwhelm the immigration courts and undercut the efficient administration of immigration law. *See generally* 8 C.F.R. § 1003.12. Consequently, I now order that all cases that are currently administratively closed may remain closed unless DHS or the respondent requests recalendaring. Upon the motion of either party, an

---

[13] Those features illustrate why continuances are a superior alternative to administrative closure for cases involving particularly vulnerable respondents. The good-cause standard, when properly applied, gives judges sufficient discretion to pause proceedings in individual cases while also preventing undue delays. For example, a continuance may allow an immigration judge to oversee an alien minor's progress in obtaining appropriate alternative forms of relief. By holding periodic hearings, the immigration judge can monitor the relief process while ensuring that the case does not get lost. Similarly, a continuance may allow a judge to reassess the circumstances of a respondent in a competency case, a valuable tool because "[m]ental competency is not a static condition" and "Immigration Judges need to consider indicia of incompetency throughout the course of proceedings." *Matter of M-A-M-*, 25 I&N Dec. 474, 480 (BIA 2011).

immigration judge or the Board, as relevant, shall recalendar the case. I expect the recalendaring process will proceed in a measured but deliberate fashion that will ensure that cases ripe for resolution are swiftly returned to active dockets.

This rule for recalendaring is no different from the types of actions that the Board has taken. *See, e.g., W-Y-U-*, 27 I&N Dec. 17 (modifying the recalendaring standards that apply to administratively closed cases). Furthermore, requiring recalendaring on the motion of either party does not conflict with the duty of immigration judges and the Board to "exercise their independent judgment and discretion" in the administration of removal proceedings. 8 C.F.R. §§ 1003.1(d)(1)(ii), 1003.10(b). Where immigration judges and the Board lack the authority to grant administrative closure in the first instance, it does not infringe on their authority to direct that they restore such cases to their calendar and decide them expeditiously and impartially.

This rule is both administrable and legally sound. Existing regulations already require the recalendaring of certain administratively closed cases upon a party's motion. *E.g.,* 8 C.F.R. §§ 1245.13(m)(1)(ii) (requiring recalendaring upon DHS motion in administratively closed cases of qualifying Nicaraguan and Cuban nationals), 1245.15(r)(2)(ii) (requiring recalendaring upon DHS motion in administratively closed cases of qualifying Haitian nationals). No court has ever deemed those provisions legally deficient, nor have there been any evident difficulties in administration. Extending that recalendaring requirement to all administratively closed cases and directing immigration judges and the Board to recalendar such cases at a party's request will ensure that all administratively closed cases are treated equally.[14]

## V.

I hereby affirm the Board's November 27 decision and remand this case to the Board with instructions to remand to the Immigration Judge to issue a new Notice of Hearing within 14 days of the date of this order. If the respondent again fails to appear, the Immigration Judge should proceed according to 8 U.S.C. § 1229a(b)(5).

---

[14] My decision also does not raise due process or retroactivity concerns. Administrative closure confers no legal entitlement to indefinite closure and has always been understood as revocable. *See Mendoza-Ramirez v. Holder*, 327 F. App'x 753, 754 (9th Cir. 2009) ("Petitioners have no constitutionally-protected liberty interest in administrative closure, as it is a matter of 'administrative convenience.'"); cf. *Khan v. Att'y Gen. of the U.S.*, 448 F.3d 226, 236 (3d Cir. 2006) ("The Government correctly argues that Khan 'has no constitutional right to have his proceedings held in abeyance while he attempts, belatedly, to restore his status.'").