**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

JULIO ENRIQUE BENEDICTO, AKA
Julio Enrique Garcia-Benedicto,
*Petitioner*,

v.

MERRICK B. GARLAND, Attorney
General,
*Respondent.*

No. 18-73237

Agency No.
A021-389-277

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted August 13, 2021
Seattle, Washington

Filed September 9, 2021

Before:  David M. Ebel,[*] Carlos T. Bea, and
Lawrence VanDyke, Circuit Judges.

Opinion by Judge VanDyke

---

[*] The Honorable David M. Ebel, United States Circuit Judge for the
U.S. Court of Appeals for the Tenth Circuit, sitting by designation.

## SUMMARY[**]

### Immigration

Dismissing in part and denying in part Julio Enrique Benedicto's petition for review of a decision of the Board of Immigration Appeals, the panel held that: 1) Benedicto, a U.S. lawful permanent resident who had been found mentally incompetent, received all possible safeguards in his removal proceedings; 2) he failed to exhaust his claim regarding the "particularly serious crime" determination; and 3) the denial of deferral of removal under the Convention Against Torture (CAT) was supported by substantial evidence.

After finding Benedicto incompetent, an immigration judge appointed a qualified representative (QR), denied Benedicto's motion to terminate, and found him removable for an aggravated felony. The IJ also concluded that his conviction was a particularly serious crime barring withholding of removal under CAT and the Immigration and Nationality Act, and denied deferral of removal under CAT. The BIA dismissed Benedicto's appeal, and amicus counsel was appointed to support Benedicto before this court.

Amicus counsel argued both that the IJ should have instituted additional safeguards to protect Benedicto's due process rights, and ultimately, given insufficient protections, should have terminated proceedings. The panel concluded it lacked jurisdiction to consider the unexhausted claim

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

regarding additional safeguards. The panel also concluded that the IJ's safeguards sufficed such that termination was not required, explaining that the IJ: (1) appointed a QR, (2) granted every continuance requested, (3) compelled document productions from the Department of Homeland Security, (4) ensured that Benedicto's QRs were able to file written pleadings and applications for relief, (5) personally questioned Benedicto to further ensure a fulsome, developed record, and (6) reviewed record evidence submitted to support Benedicto's claims for relief. Rejecting amicus counsel contention that proceedings should have been terminated because Benedicto was not able to obtain further information that might have helped him, the panel explained that the IJ's safeguards enabled Benedicto to present sufficient relevant information, and that the potential further information that amicus counsel proposed did not meet the narrow set of reasons for which an IJ may terminate under 8 C.F.R. § 1239.2(f).

Next, the panel concluded that it could not review amicus counsel's arguments regarding the particularly serious crime determination because the QR did not challenge that determination, which was the express reason the BIA relied on in finding no basis to disturb it. Were it able to review the unexhausted claim, the panel explained that amicus counsel's argument was that Benedicto's counsel was ineffective for failing to make specific arguments regarding the IJ's weighing of the facts. The panel explained that a particularly serious crime determination is inherently discretionary and that jurisdiction to review such determinations exists only when the petitioner raises a constitutional or legal question, not simply where he asks for re-weighing of factors.

The panel also rejected the contention that the IJ erred, under *Gomez-Sanchez v. Sessions*, 892 F.3d 985 (9th Cir. 2018), by not referencing Benedicto's mental illness in making the particularly serious crime determination. The panel explained that *Gomez-Sanchez* does not require the IJ to always reference a petitioner's mental health in this context; rather, consideration of mental illness is required only where the petitioner presents evidence directly attributing the crime to his mental illness. As that was not the case here, and the IJ did not explicitly exclude mental health from her analysis, but instead considered all reliable information, the panel was not convinced of any legal error.

Finally, the panel concluded that the evidence did not compel reversal of the denial of deferral of removal under CAT. Observing that the IJ and BIA agreed that Benedicto would more likely than not be arrested after he is deported, the panel explained that the record did not compel the conclusion Benedicto is more likely than not to suffer torture. As to police custody, the panel explained that the IJ and the BIA reasonably concluded that, while police in the Dominican Republic do injure detainees, the government does not demonstrate intentional complicity and the record does not compel the conclusion that any individual detainee is more likely than not to be tortured. As to prison conditions, the panel explained that the record demonstrated the Dominican Republic's substantive attempts at prison reform, such that the record did not compel an inference of torturous intent. The panel also rejected the contention that the IJ failed to analyze Benedicto's cumulative risk of torture.

## COUNSEL

Grace Leeper (argued), Jenya Godina, and Andrew Hellman, O'Melveny & Myers LLP, Washington, D.C.; Anton Metlitsky, O'Melveny & Myers LLP, New York, New York; Amicus Curiae Counsel on behalf of Petitioner.

Rachel L. Browning (argued), Trial Attorney; Keith I. McManus, Assistant Director; Brian Boynton, Acting Assistant Attorney General; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

## OPINION

VANDYKE, Circuit Judge:

### INTRODUCTION

Julio Enrique Benedicto (Petitioner or Benedicto) petitions for review of the Board of Immigration Appeals' (BIA) dismissal of his due process claims, the denial of his motion to terminate, and the denial of his application for withholding or deferral of removal under the Convention Against Torture (CAT). For the reasons stated below, we dismiss Petitioner's due process claims and deny his petition.

## BACKGROUND AND PROCEDURAL HISTORY

### I. FACTS

Petitioner is a native and citizen of the Dominican Republic who was admitted to the United States on a B-2 visitor visa when he was about 16 or 17 years old. He

adjusted status to a lawful permanent resident on September 9, 1980, when he was 22 years old. While living in New York, Benedicto was twice convicted for promoting gambling in 1983 and 1984, and convicted for disorderly conduct sometime around 1988. He testified that he used heroin daily for about two years from 1989–1991. After he moved to California, he was convicted of felony first degree burglary in 1991 and of burglary again in 1992.

On November 5, 2003, Benedicto was convicted in Washington State of two counts of domestic violence assault in the second degree (receiving 57 months for each offense) and one count of felony domestic violence harassment, for which he was sentenced to incarceration for 43 months. These sentences were to run concurrently with each other. DHS charged him as removable for being convicted of an aggravated felony for a term of imprisonment exceeding one year.

## II. PROCEDURAL HISTORY

Benedicto appeared for his first hearing in July 2016, where the IJ found him incompetent and appointed him a qualified representative (QR). At a subsequent hearing two months later, Benedicto "act[ed] rather aggressively and hostilely toward" his QR such that the court "proceed[ed] without" Benedicto in that hearing, and granted the QR a continuance. And in the next hearing in November 2016, Benedicto again was not present due to "derogatory language toward" the QR. At that point, his QR filed a motion to terminate proceedings, arguing he could not adequately represent Benedicto, which DHS opposed. The IJ granted instead the QR's motion to withdraw as counsel at the next hearing because Benedicto punched the QR in the face. But the IJ denied the motion to terminate and reset the hearing "for another [QR] to see if that is possible and to see

if perhaps [Benedicto] can be assisted with any type of treatment or medical assistance."

In the hearing in February 2017, a new QR appeared telephonically and, although she had "review[ed] the entire physical record," she requested a continuance because in her prior conversations with Benedicto he "indicate[d] that he [would] … now sign" authorization so that the QR could obtain further records.  The continuance was granted.  The same QR appeared telephonically on March 9, 2017, while Benedicto appeared in person and provided the court with FOIA-requested results documenting his prior immigration proceedings in California in 1994.  The QR stated she now intended to file a motion to terminate, because although she "spoke[] to [Benedicto] on various occasions" and that "[i]t seems that cooperation might be imminent," he still refused to authorize the QR to obtain documents on his behalf.  The IJ granted a further continuance.

On March 24, 2017, the IJ ordered DHS to produce documents requested by Benedicto relating both to his immigration status and prior proceedings and ordered the QR to file written pleadings and applications for relief.  DHS made two document productions on March 27 and May 4 of 2017, and another prior to the merits hearing in August.  In May 2017, the QR requested a further continuance to "explor[e] a possible readjustment if … [she could] locate adult U.S. citizen children," which the IJ granted.  The QR subsequently filed written pleadings contesting removability and an application for asylum, withholding of removal, and protection under CAT.  In August 2017, the IJ took testimony on Benedicto's application for asylum-related

relief. After further briefing, the IJ denied relief and ordered Benedicto removed.[1]

## A. IJ Decision

### i. Removability

The IJ determined that Benedicto was removable as an alien who "has been convicted of an aggravated felony …, a crime of violence, for which a term of imprisonment ordered is at least one year." The IJ determined that Benedicto's conviction for felony harassment–domestic violence was divisible under the modified categorical approach and, based on the record of conviction, concluded "that the record necessarily establishes that [Benedicto] was … convicted" under the portion of the statute that "requires a knowing threat of intent to kill another person." The IJ concluded this conviction was "an aggravated felony crime of violence" sufficient to sustain removal.

### ii. Testimony

Benedicto testified that he was subject to an immigration proceeding in California in 1994 and that the hearing transcript should show the IJ acknowledged that he has American citizenship "because of his father." While the IJ

---

[1] In September 2017, DHS added to the charges in the NTA, claiming that other convictions in Benedicto's record also demonstrated removability under (1) INA § 237(a)(2)(A)(ii) for being convicted of two or more crimes involving moral turpitude (CIMT), and (2) INA § 237(a)(2)(E)(i), as an alien who has been convicted of a crime of domestic violence or child abuse. The IJ found Benedicto removable for having been convicted of two or more CIMTs, but declined to find him removable under INA § 237(a)(2)(E)(i). The BIA ultimately relied only on DHS's original removability charge for an aggravated felony crime of violence.

"acknowledged [Benedicto] was in immigration proceedings in 1994 and his case was administratively closed pending state prosecution," she concluded that Benedicto "was ineligible to derive citizenship from his father at the time because [he] had already turned eighteen years old on May 25, 1976 prior to his father's naturalization."

Benedicto testified that he was afraid to return to the Dominican Republic because "his cousin [Freddy Garcia] has been running the government," was "waiting for him," and would "kill him … in order to get all of the money" he inherited from his mother.

When asked about the circumstances underlying his felony domestic violence conviction, Benedicto testified he "was defending himself from his ex-girlfriend and her son who were jumping him," and that they were working with the Washington State police, who "followed him for three years and tapped his phone." Benedicto averred that he was competent, had no mental health problems, and did not need a lawyer.

### iii. Competency

The IJ determined Benedicto was "not competent to represent himself." The IJ decided that she must "implement appropriate safeguards to ensure that [his] rights are protected," and that she had "discretion to determine which safeguards are appropriate." The IJ catalogued that she had granted all continuance requests from Benedicto's QR "to gather evidence and complete an application for relief," provided two explanations of Benedicto's rights and the charges in the Notice to Appear, "allowed counsel to appear telephonically, [and] independently questioned" Benedicto herself during the merits hearing. Notwithstanding these numerous safeguards, Benedicto's QR moved for

termination because she felt Benedicto "was not afforded due process."

The IJ denied the QR's request for termination because she found that the court "implemented sufficient safeguards to ensure [Benedicto] receive[d] a fundamentally fair hearing." The IJ noted she "can only terminate under a limited set of circumstances …. [n]one of which apply here." The IJ found "the country conditions evidence … sufficient for the Court to make a ruling on the merits" and determined DHS "met its burden of proving [Benedicto] is removable."

### iv. Credibility

Acknowledging that credibility for individuals with mental illness "should be addressed on a case-by-case basis," the IJ "accept[ed] [Benedicto's] testimony as an accurate depiction of his subjective understanding of his fears of future harm in the Dominican Republic." But because some of his testimony may "be the result of [Benedicto's] mental health difficulties …. [t]he Court look[ed] to the objective evidence in the record to determine whether or not [Benedicto] … met his burden of proof for relief."

### v. Withholding of Removal under INA and CAT[2]

The IJ observed that Benedicto would be ineligible for withholding of removal under INA and CAT if the IJ determined, in her discretion, that his aggravated felony

---

[2] Because the IJ found Benedicto was convicted of an aggravated felony, she determined he was statutorily ineligible to apply for either cancellation of removal or asylum.

qualified as a "particularly serious crime." The IJ looked first to the elements of the crime, which "demonstrate[d] the serious nature of the offense." The IJ then evaluated the "circumstances and underlying facts," which involved "all reliable evidence in the record" including "the judgment of conviction and sentence, second amended information, certificate for determination of probable cause, and Prosecuting Attorney Case Summary and Request for Bail and/or Conditions of Release." Testimony included in this information demonstrated that Benedicto threatened his partner with a handgun and "'grabbed her by the shoulders and threw her to the ground.' When [the son] tried to intervene to protect his mother, [Benedicto] struck him twice in the head with the gun causing him to bleed from the head and seek medical care." This information combined with "the severity of [Benedicto's] sentence" led the IJ to conclude that the conviction was for a particularly serious crime and deny Benedicto's application for withholding of removal under INA and CAT.

### vi. Deferral of Removal under CAT

The IJ "consider[ed] all evidence relevant to the likelihood of future torture," given that Benedicto "never claimed he was harmed in the past in the Dominican Republic." The IJ considered Benedicto's testimony that his cousin, Freddy Garcia, was in charge of the Dominican Republic and "wants to kill him." Although the IJ did "not dispute the sincerity and credibly [sic] of [Benedicto's] testimony, …. none of the evidence in the record supports [Benedicto's] belief[s]." The IJ observed the current president of the Dominican Republic was Danilo Medina, who was elected through a "generally free and orderly" process and "there is no indication that an individual by the

name of Freddy Garcia has the power … over the national security forces to order such a targeted assassination."

Evaluating torture by the police or prison system in the Dominican Republic, the IJ agreed that, given his past history, Benedicto was "more likely than not" to be arrested by "law enforcement following … a crime." But although police in the Dominican Republic at times use tactics that "would undoubtedly constitute torture," the record did not demonstrate the regularity of such tactics or that the tactics target the mentally ill. Furthermore, "the Dominican government is actively monitoring prisoner treatment and responding to allegations of torture." The IJ also observed that the prison system did not "demonstrate … [a] specific intent to constitute torture." The prison system had not worsened significantly, and it was "entirely possible that given [Benedicto's] mental illness, he would be placed in one of the improved 'model' prisons, which … includ[e] mental health treatment."

The IJ concluded by noting it was not "more likely than not" that Benedicto would be institutionalized at the only mental health hospital in the country, both because he "refuse[s] treatment" and because "[t]here is no evidence in the record showing that law enforcement involuntarily commit mentally ill individuals." For all those "foregoing reasons, the court [found] that [Benedicto] has not established he will more likely than not be tortured in the Dominican Republic with the consent … of the Dominican government."

## B.  BIA Decision

The BIA similarly denied the motion to terminate and dismissed Benedicto's appeal. Reviewing for clear error, the BIA determined that despite Benedicto's schizophrenia

diagnosis, refusal to cooperate with his QRs, and disruptive behavior in court, the IJ had provided sufficient safeguards and, moreover, had "no inherent authority to terminate."

The safeguards regarding "the issue of alienage were sufficient" because the IJ "appoint[ed] a QR," "requested that the DHS submit evidence … relevant to [Benedicto's] status," and received "no evidence to substantiate" Benedicto's citizenship claim. The safeguards provided regarding removability ensured Benedicto through his QR was able to deny the factual allegations and "fully brief the legal issues." The safeguards regarding the applications for relief were also sufficient because the QR received "liberal[]" continuances and submitted an application for relief. The IJ personally asked Benedicto questions "during the merits hearing," "credited [his] subjective beliefs" about persecution from his cousin, and compared it to the "objective evidence of record." Because additional facts regarding Benedicto's claims of future torture could "be developed without the need for [Benedicto's] testimony," the BIA concluded he "was afforded a fundamentally fair" process.

On the merits, the BIA affirmed that Benedicto was removable because his felony harassment–domestic violence conviction constituted "an aggravated felony under [INA] section 101(a)(43)(F)." The BIA observed Benedicto did "not challenge" the IJ's determination that Benedicto's aggravated felony constituted a particularly serious crime barring him from withholding of removal and "therefore [found] no basis to disturb it."

The BIA concluded that Benedicto also failed to "set forth a valid claim for deferral of removal under" CAT. Agreeing that "it is more likely than not that [Benedicto] will enter police custody" after he is returned to the Dominican

Republic, the BIA observed that the instances of torture in the record do not "establish that [Benedicto] is more likely than not to be subjected to a torturous level of harm" while in custody. Even if Benedicto was imprisoned in an overcrowded prison, he did not "establish" that the Dominican government had a "specific intent to torture inmates" or those with mental illness.[3] The BIA dismissed Benedicto's appeal.

## DISCUSSION

## I.  Benedicto Received Due Process.

Given Benedicto's mental health issues, amicus counsel was appointed to support him in his proceedings before this court. Benedicto's amicus counsel alleges that the IJ failed to provide adequate safeguards to ensure due process after deeming Benedicto not competent to represent himself. This court reviews due process allegations de novo, *Cinapian v. Holder*, 567 F.3d 1067, 1073 (9th Cir. 2009), the "critical question [being] '[w]hether the IJ's actions prevented the introduction of significant testimony.'" *Oshodi v. Holder*, 729 F.3d 883, 890 (9th Cir. 2013) (citation omitted). This court must determine whether, after the IJ's mental incompetency finding, Benedicto received adequate "safeguards to protect [his] rights and privileges" during the proceedings, such that he could "have a reasonable opportunity to examine the evidence" and "to present evidence on [his] own behalf." 8 U.S.C. § 1229a(b)(3), (4); *see also Matter of M-A-M-*, 25 I. & N. Dec. 474, 479 (BIA

---

[3] The BIA agreed with the IJ that "there is insufficient evidence" that a man named Freddy Garcia would harm Benedicto or that Benedicto would "either voluntarily seek treatment or be involuntarily committed to a mental health facility."

2011). "[T]he ultimate determination of which safeguards to implement and whether they are adequate to ensure the fairness of proceedings is discretionary." *Matter of M-J-K-*, 26 I. & N. Dec. 773, 776 (BIA 2016).

Amicus counsel argues both that the IJ should have instituted additional safeguards, and ultimately, given the insufficient protections, should have terminated proceedings. This court lacks jurisdiction to consider the unexhausted claim that additional safeguards would have enhanced Benedicto's proceedings.[4] Given the record in this case, the IJ's safeguards sufficed to provide Benedicto with due process such that termination was not required.

## A. The IJ Provided Sufficient Safeguards.

The IJ instituted numerous safeguards to accommodate Benedicto's mental illness and Benedicto's proceedings were not "so fundamentally unfair that [he was] prevented from reasonably presenting [his] case." *Grigoryan v. Barr*, 959 F.3d 1233, 1240 (9th Cir. 2020). The IJ implemented several procedural safeguards: she (1) appointed a QR, (2) granted every continuance requested, (3) compelled document productions from DHS, (4) ensured that Benedicto's QRs were able to file written pleadings and applications for relief, (5) personally questioned Benedicto to further ensure a fulsome, developed record, and

---

[4] Although amicus counsel argues that the IJ should have explored further safeguards, these claims were not raised to the BIA. Rather, Benedicto's QR before the BIA explicitly argued that "the IJ exhausted all possible safeguards." We lack jurisdiction to consider claims that were never raised to the agency. *See Arsdi v. Holder*, 659 F.3d 925, 928−29 (9th Cir. 2011).

(6) reviewed record evidence submitted to support Benedicto's claims for relief.

Benedicto's amicus counsel counters that because during the immigration proceedings Benedicto did not retrieve further information from a newly-discovered A-file, and because his QR did not locate alleged family members who may have supported his claims of alleged persecution in the Dominican Republic or filed an I-130 petition on his behalf, the IJ should have terminated Benedicto's proceedings. But the procedural safeguards discussed above enabled Benedicto and his QRs to present "sufficient relevant information" supporting his claims for relief and challenge his removability. *Matter of M-J-K-*, 26 I. & N. Dec. at 776. The avenues of *potential* further information that amicus counsel proposes do not meet the narrow set of reasons for which an IJ may terminate proceedings. *See* 8 C.F.R. § 1239.2(f).

### i.   Alienage Claims

Benedicto provided the court information obtained through a FOIA request that listed a different A-number attached to his name than the one under which this current immigration case was proceeding. Amicus counsel argues that because Benedicto would not authorize his QR to "obtain further documents," continuing without the potential information obtainable under that second A-file number violated due process because "the IJ lacked sufficient reliable information as to [his] citizenship" status. But based on the record, amicus counsel cannot articulate any possible way that Benedicto could have derived citizenship and thus cannot allege a due process violation on these grounds.

Benedicto consistently claims that, as a consequence of his father's citizenship, he obtained citizenship in an

immigration hearing that occurred after he was arrested in California in 1994. Benedicto provided a July 15, 1994 immigration court order to the IJ, which noted the proceeding concluded due to "Administrative Closing–Other:" "pending state prosecution."[5] Amicus counsel argues that this information could demonstrate that Benedicto did receive citizenship, as "DHS apparently did not reinstate removal proceedings after [Benedicto] was released from state custody in the 1990s."

But Benedicto's testimony and other record evidence flatly contradict this argument. Benedicto's father naturalized on March 8, 1977, when Benedicto was already eighteen years old, and Benedicto did not acquire lawful permanent resident status until he was twenty-one years old. Under the law at the time, he could not have derived citizenship at the time of his father's naturalization. *See* 8 U.S.C. § 1432(a) (repealed 2000)). Amicus counsel provides no response to this legal reality, and simply steadfastly argues that the records are "incomplete." This reply does not provide any viable way that more documentary information could have justified Benedicto's citizenship claims.

The IJ's decision to continue with Benedicto's hearing despite a lack of further information from this new A-number did not deny Benedicto due process as both Benedicto's QR conceded and the IJ confirmed that Benedicto "would not have been eligible to derive … any citizenship" through his father in 1994. "Because none of the grounds [Benedicto] raises would have been a proper

---

[5] The "state prosecution" presumably referenced the conclusion of the state criminal proceedings following Benedicto's felony theft charge in Los Angeles.

basis for relief …, he suffered no prejudice by being denied access to [documents that] could adjudicate facts that might support these claims." *Morales-Izquierdo v. Gonzales*, 486 F.3d 484, 496 (9th Cir. 2007) (en banc).

### ii. Fear of Persecution

Amicus counsel posits that, were Benedicto's QR able to have more substantive conversations with Benedicto, his family, or his friends, then the QR might have been able to present a viable claim of past or future persecution in the Dominican Republic. But the IJ implemented sufficient safeguards to ensure Benedicto had an opportunity to proffer testimony and the lack of participation from supportive family or friends does not demonstrate he was denied due process.[6]

The IJ "appl[ied] the safeguard of legal representation," and even though Benedicto told his QR very little, "even without assistance from the respondent, counsel … provide[d] relevant objective documentation, such as background or country conditions evidence, to assist in adjudicating an application for relief." *Matter of M-J-K-*, 26 I. & N. Dec. at 777.[7] While the continuances did not produce family members willing to testify on Benedicto's behalf, that is not a requirement for due process. The IJ did not "*refus[e]* to permit family members to develop the record," *Zolotukhin v. Gonzales*, 417 F.3d 1073, 1076 (9th

---

[6] It is worth noting Benedicto's claims of persecution have changed. When interviewed at the beginning of his 2016 removal proceedings, he "expressed no fear if he is returned to his country of citizenship."

[7] Amicus counsel's contention that the IJ's continuances "did nothing to help develop the record," is demonstrably incorrect as it allowed counsel to file briefs alleging eligibility for relief.

Cir. 2005) (emphasis added), there simply were none that Benedicto or his QR could identify to either counsel or the IJ.**[8]** In such situations, when family of the petitioner "cannot reasonably be found or fails or refuses to appear, the custodian of the respondent shall be requested to appear on behalf of the respondent." *Wong v. INS*, 550 F.2d 521, 523 (9th Cir. 1977) (citation omitted). Here, "[t]hroughout the hearing before the immigration judge petitioner was … accompanied by … his counsel," *id.*, who provided fulsome written support for his claims for relief.

Given the difficulties in the relationship between Benedicto and his QR, the IJ determined that she would directly question Benedicto to "seek[] to have an informal dialogue with [Benedicto] through which the court can build rapport with [Benedicto] as well as gather additional information about" his claims of persecution. This direct questioning, rather than fail to "adduce meaningful testimony," went on for pages of transcript, and culminated in the IJ's conclusion that Benedicto's testimony was consistent with his letters and other written statements and was "an accurate depiction of his subjective understanding of his fears of future harm in the Dominican Republic." The IJ did not make an adverse credibility finding, but rather compared Benedicto's testimony with the facts in the record and was unable to find factual support for his subjective beliefs. Given that the IJ "aid[ed] in the development of the

---

**[8]** Whether Benedicto actually has any children remains a mystery. In 1991 he told his probation officer he had no children from his previous marriage in 1988 and no children from his then-current year and a half relationship. In 1992 he claimed he did have children from his 1988 marriage but did not know where they lived—he "believe[d] [his ex-wife] is living in Miami, Florida." At the beginning of these proceedings in 2016, he stated he had no children.

record," and ensured Benedicto had "a reasonable opportunity to … present evidence" and "consult with the attorney," the IJ provided sufficient safeguards to allow Benedicto to present his case and did not violate due process. *See Matter of M-A-M-*, 25 I. & N. Dec. at 479, 482.

Amicus counsel's speculation that more testimony from Benedicto or from family members could have provided more insight into his claims of persecution is not enough to establish "plausible scenarios in which the outcome of the proceedings would have been different if a more elaborate process were provided." *Tamayo-Tamayo v. Holder*, 725 F.3d 950, 954 (9th Cir. 2013) (citation omitted). There was no due process violation arising from the lack of additional testimony during Benedicto's merits hearing.

### iii. A Meaningful Opportunity to Adjust Status

Amicus counsel contends lastly that the IJ should have terminated proceedings because Benedicto may have been eligible to adjust status under INA § 212(h) or through an I-130 petition filed by his U.S.-citizen son (if he has a U.S. citizen son). But all the caselaw cited by amicus counsel contemplates a "pending" adjustment application. *See Malilia v. Holder*, 632 F.3d 598, 606 (9th Cir. 2011) (addressing a pending visa petition); *Kalilu v. Mukasey*, 548 F.3d 1215, 1218 (9th Cir. 2008) (addressing a pending I-130 petition). At the time of Benedicto's hearing, there was no evidence of a pending 212(h) or I-130 petition and amicus counsel could only hypothesize that, even if family exists and could be found, that they would be willing to help Benedicto (despite his violent temperament, criminal background, and apparent lack of a current relationship with them).

But given that "[t]he [IJ] *should not* grant a continuance," much less terminate proceedings, "merely because the respondent expresses the intention to file for collateral relief at some future date," the IJ did not err in declining to terminate proceedings. *Matter of L-A-B-R-*, 27 I. & N. Dec. 405, 415–16 (A.G. 2018) (emphasis added); *see Sandoval-Luna v. Mukasey*, 526 F.3d 1243, 1247 (9th Cir. 2008) (per curiam).  Amicus counsel again does not present a "plausible scenario" in which Benedicto would be granted relief if the IJ chose to terminate proceedings. *Morales-Izquierdo*, 486 F.3d at 495.

### iv.  Termination Was Not Required

Because Benedicto received due process through the IJ's safeguards in his removal proceedings, there was no need for the IJ to terminate proceedings.  A QR provided "background or country conditions evidence, to assist in adjudicating an application for relief," and the IJ facilitated an opportunity for Benedicto to present his own testimony. *Matter of M-J-K-*, 26 I. & N. Dec. at 777.  Ultimately, termination is appropriate only where "the alien has established prima facie eligibility for naturalization and the matter involves exceptionally appealing or humanitarian factors; in every other case, the removal hearing shall be completed as promptly as possible."  8 C.F.R. § 1239.2(f). In a case like Benedicto's, "Immigration Judges should be particularly reluctant to terminate proceedings where, as here, the alien has a history of serious criminal conduct and may pose a danger to himself or others upon his release into the community." *Matter of M-J-K-*, 26 I. & N. Dec. at 777 n.4.  Termination was thus not warranted or appropriate in Benedicto's case.

Furthermore, amicus counsel's arguments implicitly boil down to a singular theme.  Amicus counsel's position would

require that when a mentally ill petitioner makes a statement, regardless of its plausibility, the IJ must require that any reasonable argument or possible facts tangentially related to that claim be entirely investigated *with cooperation of the petitioner*, or else proceedings must be terminated.  But even when presented with a mentally ill petitioner, IJs confronted with fantastic testimony should not have to prove a negative—which would often be impossible to do—to avoid terminating proceedings.  Instead of forcing QRs to go down every conceivable rabbit hole related to a mentally ill petitioner's musings, no matter how implausible or unsupported by any other evidence, IJs should do just what the IJ did here: obtain available evidence from government records, appoint a QR, and evaluate the arguments and statements made against objective evidence.  To demand otherwise would force IJs to operate inherently on speculation—as demonstrated by amicus counsel's arguments that rely heavily on speculation about Benedicto's family and childhood.[9]  Here, the IJ provided all safeguards necessary to ensure Benedicto due process.

## II. Amicus Counsel's Fact-Based Disagreements with the IJ's Discretionary "Particularly Serious Crime" Determination are Unexhausted and Unreviewable.

### A. Unexhausted

At the outset, this court may not review amicus counsel's arguments regarding the IJ's "particularly serious crime" decision because, before the BIA, appointed counsel did "not

---

[9] A rule requiring the IJ to terminate proceedings whenever the petitioner is uncooperative would also create perverse incentives. Petitioners should not be encouraged to obstruct the efforts of their QR in the hopes of terminating the entire proceeding.

challenge this aspect of the Immigration Judge's decision," which is the express reason the BIA relied on in finding "no basis to disturb it." While amicus counsel contends this was ineffective assistance from prior counsel, "[c]ounsel should not expect to resurrect hopelessly neglected points before this court by claiming that they involved due process and thus could not have been considered by the BIA." *Liu v. Waters*, 55 F.3d 421, 426 (9th Cir. 1995); *see Tall v. Mukasey*, 517 F.3d 1115, 1120 (9th Cir. 2008) (due process claims "that can be remedied by the BIA are not exempted from the exhaustion requirement").

The proper way to raise and exhaust an ineffective assistance of counsel claim in this situation is through a motion to reopen before the agency. Amicus counsel acknowledges this but claims "a motion to reopen is not a realistically available remedy." But amicus counsel is not prevented from filing a motion to reopen with the agency on Benedicto's behalf, and this court simply does not have jurisdiction to review claims not raised to the BIA. *Ortiz v. INS*, 179 F.3d 1148, 1152 (9th Cir. 1999) ("Because the Ortizes did not raise the issue … before the BIA, we lack jurisdiction to consider that claim. The Ortizes are free, however, to raise this issue before the BIA in the form of a motion to reopen.") (citation omitted); *cf. Bare v. Barr*, 975 F.3d 952, 961 (9th Cir. 2020) (reviewing an unraised claim only where the "BIA was sufficiently on notice" to pass on the argument and the BIA chose not to do so).

## B.  Unreviewable

Were the panel able to review the unexhausted claim, the crux of amicus counsel's argument is that Benedicto's counsel was ineffective for failing to make specific arguments regarding the IJ's weighing of the facts in her "particularly serious crime" determination. But this court

has "decided that a 'particularly serious crime' determination is inherently discretionary." *Pechenkov v. Holder*, 705 F.3d 444, 448 (9th Cir. 2012). Jurisdiction to review such determinations only exists in a very narrow circumstance: when the petitioner raises "a constitutional or legal question," not simply where "he asks for a re-weighing of the factors." *Id.*

Amicus counsel contends that the IJ legally erred in making her "particularly serious crime" determination without referencing Benedicto's mental illness, because "the IJ must consider 'all reliable, relevant information … including the defendant's mental condition at the time of the crime.'" (quoting *Gomez-Sanchez v. Sessions*, 892 F.3d 985, 996 (9th Cir. 2018)). But this argument extends *Gomez-Sanchez* beyond its context—the IJ here did not legally err by focusing on the record evidence in making her "particularly serious crime" determination.

Amicus counsel ask us to extend *Gomez-Sanchez* beyond the bounds our court has established. *Gomez-Sanchez* did not impose a new standard that the IJ must always reference a petitioner's mental health in a "particularly serious crime" determination. Rather, as our court has previously explained, albeit in an unpublished decision, the consideration of mental illness anticipated by *Gomez-Sanchez* is required only where the "[p]etitioner … present[s] … evidence directly attributing the [crime] to his" mental illness. *Galeana v. Rosen*, 833 F. App'x 136, 137 (9th Cir. 2021). Here, neither Benedicto nor his QR attributed his domestic violence felony to his mental illness. Because the IJ provided competent counsel and the opportunity for Benedicto to testify freely, she "need not … guid[e] [the petitioner] in making [his] case" by prompting the petitioner or his QR to attribute his crime to

his mental illness. *Hussain v. Rosen*, 985 F.3d 634, 644 (9th Cir. 2021). Even if Benedicto's mental illness contributed to his years-prior crime, neither he nor his QR raised the issue for the IJ, and this court does not have jurisdiction to raise and review the argument on appeal.[10]

While the IJ and BIA cannot "categorically bar[]" consideration of "relevant, reliable evidence of mental health" at the time of the crime, *Gomez-Sanchez*, 892 F.3d at 995, the IJ here did not explicitly exclude Benedicto's mental health from her analysis of his felony domestic violence crime, but instead "consider[ed] 'all reliable information.'" The IJ highlighted the documents in Benedicto's "record of conviction" and reviewed related record evidence. Nothing in those documents indicated that Benedicto was suffering from mental illness at the time of his crime. Ultimately, amicus counsel has not convinced us that its arguments present a claim of *legal* error, and this court does not have jurisdiction over any claimed abuse-of-discretion. *Pechenkov*, 705 F.3d at 448–49 (explaining that "[8 U.S.C.] § 1252(a)(2)(D) cannot restore jurisdiction to review a 'particularly serious crime' determination where" the challenge is that the agency "incorrectly assessed the facts").

---

[10] Even if the IJ had erred and Benedicto's crime was not particularly serious, he still could not demonstrate any prejudice from the IJ's error, because any withholding of removal claim would be destined to fail for the same reason his CAT deferral claim fails. As with the discussion below observing that the record does not quantify Benedicto's risk of torture, he does not demonstrate he has a risk of targeted persecution—he can point only to examples of persecution in various reports in the record and claim similar persecution *could* happen to him, with no individualized assessment of *his* risk.

## III.     The Evidence Does Not Compel Reversal of the BIA's Denial of Deferral of Removal under CAT.

This court reviews for substantial evidence the BIA's denial of deferral of removal upon its determination that a petitioner failed to demonstrate that he is more likely than not to face torture upon removal. *Lemus-Galvan v. Mukasey*, 518 F.3d 1081, 1084 (9th Cir. 2008), *overruled on other grounds by Maldonado v. Lynch*, 786 F.3d 1155 (9th Cir. 2015). This analysis "requires a two part analysis—first, is it more likely than not that the alien will be tortured upon return to his homeland; and second, is there sufficient state action involved in that torture." *Garcia-Milian v. Holder*, 755 F.3d 1026, 1033 (9th Cir. 2014) (internal quotation marks omitted). Amicus counsel argues that the IJ "erred in entirely discounting Mr. Benedicto's testimony" when evaluating his claim for deferral of removal under CAT[11] and claims the record compels the conclusion that the Dominican Republic's government neglects oversight of its police and prisons to such an extent that it constitutes intentional torture. A review of the record demonstrates that documented improvements in the Dominican Republic's police and prison operations do not compel the inference that the government would intentionally torture Benedicto were he to be arrested after removal.

---

[11] The IJ did not "entirely discount" Benedicto's testimony detailing his fear of future torture if he were removed. The IJ expressly did "not dispute the sincerity and credibly of [Benedicto's] testimony; the [IJ] note[d] the difficulty of determining what portions of [Benedicto's] testimony are literally true" and thus compared Benedicto's subjective and frankly often-implausible testimony to the country evidence in the record.

## A.  Police Custody

Amicus counsel contends that Benedicto will more likely than not be arrested due to his mental illness and criminal proclivities and then be tortured by Dominican police. While both the IJ and BIA agree that Benedicto would more likely than not be arrested after he is deported, the record does not compel the conclusion Benedicto is more likely than not to suffer torture at the hands of Dominican police. This court previously determined that "generalized evidence of violence and crime" in a country that "is not particular to [the] Petitioner[ ] . . . is insufficient to meet th[e] standard" for deferral of removal under CAT. *Delgado-Ortiz v. Holder*, 600 F.3d 1148, 1152 (9th Cir. 2010). Instead, petitioners "must show that severe pain or suffering was specifically intended," *Villegas v. Mukasey*, 523 F.3d 984, 989 (9th Cir. 2008), which can be inferred from the "government's complicity in creating those conditions." *Ridore v. Holder*, 696 F.3d 907, 917 (9th Cir. 2012).

Here, the record excerpts that the BIA cited demonstrate that the Dominican Republic's government is addressing, with varied success, torturous police practices. The Amnesty International report in the record documents that "[s]ignificant progress has been made in bringing to justice police officers responsible for human rights violations, especially since the abolition of separate police and military courts." The Department of State country report observed that the Dominican "[a]uthorities fired or prosecuted police officers found to have acted outside of established police procedures," and "[i]n July [2016] the government approved a police reform law to curb corruption, improve training, and increase transparency." The IJ and the BIA reasonably concluded based on this information that, while police in the Dominican Republic can and do injure detainees, the

government does not demonstrate intentional complicity with those injuries, nor does the record compel the conclusion that any individual detainee is more likely than not to be tortured. *Cf. Ridore*, 696 F.3d at 917.

## B. Prison Conditions

Amicus counsel contends that once Benedicto is arrested and imprisoned, he will more likely than not be tortured with the consent of the government due to the poor conditions in Dominican Republic prisons. But again, this court is "not compelled to reverse the underlying factual findings because we found nothing in the record that indicated specific intent where there was also evidence of the [Dominican] government's desire to improve conditions." *Guerra v. Barr*, 974 F.3d 909, 914–15 (9th Cir. 2020).[12]

The prison conditions in the Dominican Republic range from "from compliance with international standards in 'model' prisons or correctional rehabilitation centers (CRCs), to harsh[er] … 'traditional' prisons." This decreases the likelihood by some unquantified amount that

---

[12] Amicus counsel points to the BIA's affirmation of the IJ's prison analysis, arguing that the IJ cited to improvements in *police detainee* practices and that the BIA using that citation in its discussion of prison conditions is a mistake constituting legal error. Amicus counsel's selective citation misses that the section of the report the IJ referenced discusses "law[s] prohibiting torture … of detainees *and prisoners.*" And while the sentences prior to the statement that "[t]he Attorney General's Office … did not receive any formal complaints of torture during the year" discuss detainees, the *next* sentence observes the "Attorney General's Office officially instructed local prosecutors to monitor *prisoner* treatment and allegations of torture," implying that the formal complaints could come from detainees or prisoners. The BIA did not legally err in referencing this section of the country report, which, viewed in context, applied to both detainees and prisoners.

Benedicto would be placed in a "traditional prison," and the IJ observed that "it would call for too much speculation" that Benedicto would absolutely be placed in a "traditional prison." Were Benedicto placed in a CRC after arrest, as a "prisoner[] with mental disabilities [he could] receive[] treatment, including therapy, for [his] condition[]." But even in the "traditional prisons," "the Directorate of Prisons[] instituted a program" to improve the health of prisoners and "[t]he government permitted visits and monitoring by independently funded and operated … NGO observers and media." The record demonstrates the Dominican Republic's substantive attempts to reform "traditional prisons" to "model prisons," such that it does not compel an inference of torturous intent. *Cf. Ridore*, 696 F.3d at 917.

## C.  Aggregate Risk of Torture

Finally, amicus counsel contends that the IJ, despite analyzing each claim of future torture in-depth, failed to analyze Benedicto's *cumulative* risk of torture. But the IJ explicitly noted it "must consider all evidence relevant to the likelihood of future torture," and concluded that for all those "foregoing reasons, the court finds that Respondent has not established he will more likely than not be tortured." Because there is no evidence that the IJ failed to "give reasoned consideration to potentially dispositive … evidence" or neglected to "address [an] argument," there is no merit to amicus counsel's claim that either the IJ or BIA failed to consider Benedicto's aggregate risk based on the entire record. *Cf. Cole*, 659 F.3d at 775.

Ultimately, while both the IJ and the BIA acknowledge some torture occurs in the Dominican Republic, nothing in the record quantifies the risk of that torture or "demonstrate[s] … any regularity" of such activity. Without

such information, there is no way to justify granting deferral of removal under CAT based on either of amicus counsel's theories of possible torture. Simply pointing to evidence of instances of torture, without more, cannot establish that Benedicto himself would "more likely than not" be tortured on removal. Anecdotes—no matter how disturbing—can't substitute for quantitative evidence, which is what CAT requires. The BIA's denial of deferral of removal under CAT was supported by substantial evidence. *Cf. Cole*, 659 F.3d at 773 (record evidence quantifying the risk of torture).

## CONCLUSION

The IJ ensured that Benedicto received all possible safeguards in his removal proceedings, and Benedicto failed to exhaust his claim regarding the IJ's "particularly serious crime" determination. And amicus counsel has not shown the evidence compels the conclusion that the agency erred when it rejected the argument that Benedicto would more likely than not be tortured upon removal. We accordingly dismiss his due process claims and deny the petition.

**DISMISSED in part, DENIED in part.**