**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-1910
_____

BIN KANG,

Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES OF AMERICA
_____

On Petition for Review of an Order of the
Board of Immigration Appeals
(Agency No. A095-856-446)
Immigration Judge: Lisa de Cardona
_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
on February 13, 2024

Before: BIBAS, PORTER, and MONTGOMERY-REEVES, Circuit Judges

(Opinion filed: February 29, 2024)
_____

OPINION[*]
_____

PER CURIAM

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

Bin Kang, a citizen of China, has filed a pro se petition for review (PFR) to challenge a decision of the Board of Immigration Appeals (BIA) that ordered him removed from the United States. The PFR will be denied.

I.

Kang is an expert in the fields of molecular and genetic plant research. He was admitted to the United States in 2000 with a J-1 (cultural exchange) visa. Years later, Kang was permitted to switch to an F-1 student visa. Kang was authorized to attend Kaplan Test Prep School, and later Temple University, in Philadelphia.

Kang's enrollment at Temple was terminated soon after his arrest by officers of the University of Pennsylvania, where Kang had been employed as a researcher. Kang eventually pleaded guilty to defiant trespass and was sentenced to a term of probation.

Meanwhile, Kang had been issued a Notice to Appear and charged by the Department of Homeland Security with removability under 8 U.S.C. § 1227(a)(1)(C)(i) ("Any alien who was admitted as a nonimmigrant and who has failed to maintain the nonimmigrant status in which the alien was admitted or to which it was changed . . . is deportable."). Removal proceedings were closed while Kang was in state custody because of a violation of his probation, then reopened at the Government's request.

Kang appeared before the Immigration Judge (IJ) pro se. He relayed that he was unable to find an attorney, and that he suffered from mental illness but could not afford medication. Kang expressed that he did not understand much of what the IJ was trying to convey. The IJ continued the case so that Kang could seek out help from social services and return in a composed state.

At the next hearing, Kang appeared unfocused and told the IJ that he was homeless and hungry. The IJ questioned whether she could proceed, given Kang's state. Kang relayed that he had lost all documents related to his case and was indifferent to the prospect of removal. See A.R. 224 (Kang: "It doesn't matter. Whatever you say. You want me to stay, I stay. You want me go, I go."). The IJ provided Kang with a list of shelters, implored him to find legal representation, and continued the case.

Kang arrived at the next immigration hearing with a bandage around his head, as he had been assaulted the night before. Kang called 9-1-1 while he was in court. See A.R. 232 (IJ: "The court is waiting for the emergency services to arrive. Respondent has his head down on the table in the front of the court. He is coughing and spitting into the trash can with his coughs. And apparently it appears that emergency services are here, so the court will now adjourn and continue this matter.").

At the following hearing, Kang said that he had just come from the hospital but could not produce evidence of his visit. The IJ offered Kang the opportunity to consult with a pro bono attorney. Kang, however, was uncooperative. See A.R. 246, 249 (Kang: "You can give this offer to my wife. She maybe wants to stay in your country . . . I do not want to hang out with you. * * * All attorney like a dog, like a wolf, like animal."). The IJ made a finding that Kang was "incompetent to represent [himself] in immigration court due to a mental impairment." A.R. 260. The case was continued yet again.

Before the next hearing, Kang repetitively called the immigration court to state his dissatisfaction with the pro bono attorney (Attorney Gansallo of HIAS) the IJ had recruited to represent him. The IJ reviewed the relevant facts when the court reconvened

3

and permitted Kang to proceed without Attorney Gansallo, barely one month after she had entered her appearance.

The IJ repeated in court what she had observed in prior hearings—that Kang could not meaningfully participate in his removal case. The IJ had been inclined to administratively close the proceedings, but determined that that was no longer an option in light of then-controlling decisions of the Attorney General in In re S-O-G & F-D-B, 27 I. & N. Dec. 462 (A.G. 2018), and In re Castro-Tum, 27 I. & N. Dec. 271 (A.G. 2018).[1] At the same time, the IJ expressed that Kang was an accomplished, English-proficient academic who possessed a baseline understanding of removal proceedings, the charge against him, and adjustment-of-status as a form of relief. The IJ noted that Kang now had a mailing address. The IJ also expressed that further continuing the matter would be futile because Kang was not receptive to the appointment of counsel for his defense. In light of those facts, the IJ proceeded.

But because the IJ could not get Kang to meaningfully respond to the allegations in the Notice to Appear, she denied them on Kang's behalf and directed the Government to prove its case. The IJ reviewed the documents of record then sustained the removal charge. The IJ considered whether Kang was eligible for adjustment of status, and determined that he was not because of his criminal conviction and the length of his incarceration for his probation violation. See 8 U.S.C. § 1101(f)(7). In addition, and citing 8

---

[1] Those decisions explained that IJs lack inherent authority to terminate removal proceedings; that such action is limited to circumstances defined by regulation. Both decisions have since been overruled. See In re Coronado Acevedo, 28 I. & N. Dec. 648 (A.G. 2022); In re Cruz-Valdez, 28 I. & N. Dec. 326 (A.G. 2021).

C.F.R. § 1245.1(b)(9), the IJ determined that Kang was not eligible to adjust because he had not maintained a lawful immigration status.

Kang, moreover, refused to provide a direct answer when asked whether he had a fear of returning to China, and was adamant that China's government had always treated him well. The IJ nevertheless provided Kang with a Form I-589 application for asylum. The IJ noted Kang's erratic behavior in the courtroom, then continued the case so Kang could decide whether he would file for asylum or accept voluntary departure or pursue some other yet-identified angle for relief.

When the court resumed months later, the IJ explained to Kang the details of voluntary departure and confirmed that he did not wish to apply for asylum. Kang repeatedly failed to directly answer the IJ's questions. After the IJ relayed to Kang that, at that point, there was no viable option other than voluntary departure, Kang accused the IJ of trying to force him to claim he feared a return to China. See A.R. 346 ("Well, if you make me to say I have a fear to return – return back to China, if you need that word, I put that words in my mouth. * * * I'm afraid of the Chinese government. If you need the whole sentence, I say that. * * * I'm fearful. I do not want to go back to China. I have a fear. They will – they are going to kill me. They are going to lock me up in the jail."). Following a recess, the IJ confirmed on the record with the Government that Kang's reference to his fear of harm and torture was said in "a mocking tone." See A.R. 347-48.[2]

---

[2] The record as a whole supports the IJ's assessment that Kang was flippant if not outright deceitful about his fear of returning to China. That said, "where a mental health concern may be affecting the reliability of the applicant's testimony, the [IJ] should, as a safeguard, generally accept that the applicant believes what he has presented, even

The IJ issued a written opinion formalizing her findings that Kang was mentally incompetent and unable to meaningfully represent himself without safeguards, that appointing counsel for Kang was impracticable, and that there were no friends or relatives who could assist Kang. The IJ resolved that "the only safeguard presently available is for the Court to work through Respondent's case slowly and methodically, while taking every care to accommodate Respondent's mental disability." A.R. 58. Ultimately, the IJ ordered Kang removed to China. The IJ reserved his administrative appeal.

On appeal to the BIA, Kang did not challenge his removability. Instead, he sought to reframe the circumstances of his dismissal from the University of Pennsylvania, while arguing only in general terms that the IJ had not provided adequate procedural safeguards in the removal proceedings. Kang also contended in his agency appellate brief that the IJ "exacerbated Appellant's mental disorders by setting a trick to trap Appellant: inducing Appellant to be back and forth between Ms. Gansallo and the Court for more than 10 times until Appellant became totally crazy and vulnerable, until he was tricked away $3000 by a swindler." A.R. 15.

The BIA dismissed Kang's appeal and entered a final order of removal. It upheld the IJ's finding that Kang is mentally incompetent, and found no error in the IJ's use of various safeguards to ensure that the proceedings were conducted fairly. Said the BIA:

> Regarding particular safeguards, the [IJ] took recesses to allow the

though his account may not be believable to others or otherwise sufficient to support the claim." In re J-R-R-A-, 26 I. & N. Dec. 609, 612 (BIA 2015). There was no prejudicial error under J-R-R-A in this case, however, because the IJ reviewed the relevant country reports and independently assessed whether Kang could have an objectively reasonable fear of removal, Kang's apparent prevarication notwithstanding.

6

respondent to compose himself, and granted continuances to allow him time to seek treatment and consider his options. She denied the factual allegations and charge of removability on the respondent's behalf and determined that DHS met its burden of establishing removability based on the evidence it submitted. The [IJ] considered the respondent's statement that he adjusted status in 2011 with a National Immigrant Waiver Visa, but found no evidence that such an adjustment occurred. She considered whether the respondent could be eligible for adjustment of status, cancellation of removal, and asylum and related relief and protection from removal. However, based on the evidence of record, the [IJ] determined that the respondent was only eligible to apply for pre-conclusion voluntary departure.

A.R. 3 (citations omitted). In addition, the BIA acknowledged that administrative closure was no longer prohibited, but deemed a remand futile in light of the IJ's finding that "Kang's mental health was unlikely to improve." A.R. 4. Finally, the BIA affirmed the IJ's determination that Kang was not eligible for adjustment of status or any other form of relief from removal.

Kang then filed a pro se PFR, a motion to stay his removal, and a motion to appoint counsel. A different panel of this Court denied Kang's motions. The PFR is ripe for merits adjudication.

## II.

We have jurisdiction under 8 U.S.C. § 1252(a)(1). Insofar as the BIA reviewed the IJ's decision and issued its own opinion, we review only that opinion. See Kaplun v. Att'y Gen., 602 F.3d 260, 265 (3d Cir. 2010). Agency fact-finding is evaluated using the substantial-evidence standard, see Nasrallah v. Barr, 140 S. Ct. 1683, 1692 (2020); legal determinations are reviewed de novo, see Serrano-Alberto v. Att'y Gen., 859 F.3d 208, 213 (3d Cir. 2017).

## III.

7

As was the case on appeal to the BIA, Kang in this Court does not in his opening brief dispute that he is removable as charged. Accordingly, any removability challenge has been forfeited, even if one had been exhausted. See Khan v. Att'y Gen., 691 F.3d 488, 495 n.4 (3d Cir. 2012). Also forfeited are any arguments concerning theories of relief from removal. The issues presented by Kang in his opening brief instead all relate to the alleged unfairness of the procedures implemented by the IJ to handle the case in light of Kang's lack of competency. We turn to that topic now.

"[N]either the INA nor the regulations specify how to decide whether an individual is incompetent, or how to proceed if an individual is incompetent but it is *not* impracticable for him or her to be present." Calderon-Rodriguez v. Sessions, 878 F.3d 1179, 1182 (9th Cir. 2018). The agency has filled in the gaps. With In re M-A-M-, 25 I. & N. Dec. 474 (BIA 2011), the BIA established a test "to determine whether a noncitizen is mentally incompetent when the IJ is presented with indicia of incompetency," and held that a noncitizen's lack of competency triggers a duty "to impose safeguards on the proceedings." Hernandez Garmendia v. Att'y Gen., 28 F.4th 476, 486 (3d Cir. 2022) (citation omitted).

The BIA discerned no error in the IJ's finding that Kang was unable to meaningfully participate in his removal proceedings. Kang does not challenge that determination. It is also unquestioned that the IJ's finding triggered a duty to impose safeguards to protect Kang's interests. The parties' dispute thus revolves around whether the BIA properly determined that the safeguards employed by the IJ were adequate. We agree with the BIA's determination that they were.

The IJ exercised great patience and care with Kang, and employed several "safeguards to protect [his] rights and privileges" during the proceedings, such that he could "have a reasonable opportunity to examine the evidence" and "to present evidence on [his] own behalf." 8 U.S.C. § 1229a(b)(3), (4). Those BIA-endorsed safeguards included: (1) refusing to accept an admission of removability from Kang and holding the Government to its proof; (2) assessing whether "a family member or close friend" could "assist the respondent and provide the court with information"; (3) offering Kang pro bono representation by an attorney contacted by the court directly (in addition to providing several opportunities for Kang to find counsel on his own); (4) adjourning or recessing proceedings in order for Kang to seek medical attention, or to simply compose himself; (5) "actively aiding in the development of the record"; and (6) "reserving appeal rights for the respondent." M-A-M-, 25 I. & N. Dec. at 483.

The BIA determined that those safeguards were not only sufficient under the circumstances, but were properly articulated on the record. We have been presented with no reason to come to a different conclusion. Cf. id. at 481–82 ("Based on the statutory and regulatory parameters, we conclude that Immigration Judges have discretion to determine which safeguards are appropriate, given the particular circumstances in a case before them."). Indeed, it is not clear what else, under the law and within reason, the IJ could have done to give Kang a fair shot at defending against removal. We thus agree with the BIA that there was no abuse of discretion in this case. See Benedicto v. Garland, 12 F.4th 1049, 1058 (9th Cir. 2021) ("[T]he ultimate determination of which safeguards to

implement and whether they are adequate to ensure the fairness of proceedings is discretionary.") (quoting In re M-J-K-, 26 I. & N. Dec. 773, 776 (BIA 2016)).

Kang resists the foregoing analysis, but his counterarguments are without merit. For example, Kang argues that the BIA should have remanded proceedings so that the IJ could consider administrative closure. But he fails to address, let alone undermine, the BIA's determination that such a remand would be futile because it was unlikely Kang would regain competency. Relying on a copy of a recent prescription for an antipsychotic medication, Kang suggests in his brief that his mental state has improved. But that self-assessment has no legitimate evidentiary support, in the record that was before the BIA or otherwise. See 8 C.F.R. § 1003.1(d)(3)(iv) ("[T]he Board will not engage in factfinding in the course of deciding cases[.]"); INS v. Phinpathya, 464 U.S. 183, 188 n.6 (1984) (unsworn statements in a brief are not evidence); see also 8 U.S.C. § 1252(b)(4)(A).

Additionally, while Kang criticizes the IJ for failing to explore whether he could secure assistance in court from a friend, Kang did not identify such a friend until his reply brief in this Court. That is far too late in the day. See Garza v. Citigroup Inc., 881 F.3d 277, 284-85 (3d Cir. 2018). Regardless, Kang offers nothing to suggest that the recently identified friend would have even been willing to provide assistance during the removal proceedings.

Finally, although Kang is right that the BIA incorrectly stated in its opinion that Attorney Gansallo never formally entered an appearance *in the case*, cf. A.R. 359-60 (entry of appearance), it is plain that the BIA simply misarticulated the IJ's observation that an order prohibiting Attorney Gansallo's representation was unnecessary because Kang

"had already explained that he did not wish to be represented by Ms. Gansallo and she did not appear *in Court*," A.R. 64 (emphasis added). The BIA's misarticulation is, in any event, inconsequential because Kang does not contest that he refused to be represented by Attorney Gansallo, and there is nothing in the record indicating that Attorney Gansallo or any other lawyer would have divined from the record a viable basis to argue that Kang was eligible for relief from removal. Said differently, the minor misarticulation did not impact the BIA's rationale and, as the BIA correctly determined, the IJ's handling of the safeguard of attorney-representation did not substantially prejudice Kang. Cf. Singh v. Gonzales, 432 F.3d 533, 541 (3d Cir. 2006).

VI.

For all of the reasons given above, the PFR will be denied.